**John C. AEGERTER and Air Page Corp., Plaintiffs–Appellants,**

**v.**

**CITY OF DELAFIELD, WISCONSIN, et al., Defendants–Appellees.**

**No. 98–2422.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 3, 1998.

Decided April 19, 1999.

Dennis P. Birke (argued), Donald L. Bach, Dewitt, Ross & Stevens, Madison, WI, for Plaintiffs–Appellants.

Michael J. Lawton (argued), Lathrop & Clark, Madison, WI, for Defendants–Appellees.

Before COFFEY, EASTERBROOK, and DIANE P. WOOD, Circuit Judges.

DIANE P. WOOD, Circuit Judge.

The Telecommunications Act of 1996 was nothing if not a complex balancing act among many conflicting interests. Not the least of these were the interests of state and local governments in continuing to regulate certain aspects of this industry, and the need for a uniform federal policy. This case involves one of those tensions, as it relates to the provision of personal wireless services. The Act empowers state

and local governments to regulate the placement of facilities for personal wireless services, but their authority is not unfettered. They must now support any decision to deny certain requests for those facilities with a written opinion that is based on substantial evidence in a written record, and they may not "unreasonably discriminate among providers of functionally equivalent services." See 47 U.S.C. § 332(c)(7)(B)(iii) and (B)(i)(I). Plaintiffs-appellants John C. Aegerter and his company Air Page Corporation (to which we refer collectively as Air Page) seek to persuade us that the City of Delafield, Wisconsin, violated their rights under the Act when it denied permission to replace an existing telecommunications tower with a larger one on the same site. The district court rejected their challenge, and so do we. While the conclusions the City reached may not be the only possible ones, they find support in the written record and therefore must be respected.

## I

Air Page offers a wireless paging service, for which it uses a telecommunication tower that it first leased in 1988 and Aegerter then purchased in 1993. The tower is in a residential area of Delafield; it was built in 1964 and currently stands 360 feet tall and 27 inches wide at the base. The Delafield area is hilly, and the Air Page tower stands on one of the highest of those hills. It is thus very well positioned to send a strong signal to the entire area, and, in fact, nearly every paging service provider in the area leases space on the tower from Air Page.

When the tower was first built, the four-acre piece of land on which it stands was zoned R–2 residential, under which the tower was a permissible use. Since then, the zoning laws have become more strict, and the land is now zoned R–1 residential. But for a grandfather clause, the tower would be impermissible, but it is considered a legal nonconforming use. As such, Air Page may perform "lifetime" structural repairs or alterations on the existing tower, as long as the changes do not exceed 50% of the value of the structure. If Air Page wishes to do more, it must obtain a permit from the City.

That is exactly Air Page's problem. It wants to build a replacement tower on the same site, which offers significant topographical advantages, but the City has refused to issue a conditional use permit. The proposed new tower would be 400 feet tall (or, counting the antenna, 422 feet) and 51 inches wide at the base—"merely" another two feet, as Air Page puts it, or nearly double the existing width, as the City does. On the plus side, the new tower would be in compliance with safety and engineering standards Wisconsin enacted after the old tower was built (with which it need not comply, thanks again to grandfathering). In addition, it would provide a better signal not only for Air Page, but for all the other wireless providers who lease space on the tower. On the minus side, the area has become a tidy residential community since the original tower was built, and the residents do not relish the idea of an even bigger tower in their midst.

When Air Page first applied for its permit to build the new tower, the City staff recommended to the planning commission that the application should be granted. The commission then held a hearing, at which it heard testimony both from Aegerter and community residents. It voted to recommend denial of the permit, and the City's Common Council (the body with the final authority to decide) did so.

Air Page then filed suit in federal district court against the City, as well as the Common Council, the Plan Commission, and their members. In January 1998, the district court ruled that the City's denial of Air Page's application violated the provision of the Telecommunications Act of 1996 that states:

Any decision by a State or local government or instrumentality thereof to deny

a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

47 U.S.C. § 332(c)(7)(B)(iii). The district court ordered that the case be remanded to the City, so that it could hold a hearing and render a decision in writing that "set forth with particularity the ... specific factual bases and reasons" for denying or approving the permit. No one appealed from that decision. Instead, as the court had contemplated, the Common Council conducted a hearing and shortly thereafter issued a unanimous decision, again denying the application. The Common Council cited three grounds for its decision: (1) the proposed tower would be an expansion of a commercial use in a residential area; (2) the proposed tower would not be in aesthetic harmony with the neighborhood; and (3) granting the.permit would conflict with City policy and would result in more favorable treatment of Air Page than of other personal wireless services, which had been denied permission to construct telecommunications towers in residential neighborhoods. Air Page returned to the district court, which found in the City's favor on the merits.

## II

Before this court, Air Page has pressed two arguments: first, it claims that the City's decision must be reversed because it is not supported by substantial evidence in the record, and second, it contends that in denying the application, the City unreasonably discriminated among functionally equivalent wireless services. We consider these in turn.

When Congress uses a term of art like "substantial evidence" in a statute, we interpret it according to the common meaning of that term unless there is some indication in the law that the term is being used in a special way. Here, both parties have agreed that no such special meaning was intended for the substantial evidence standard of review in § 332(c)(7)(B)(iii). (For those who find legislative history useful, there is additional support for this proposition in H.R. Conf. Rep. No. 104–458, at 206 (1996)). Thus, we turn to the normal substantial evidence standard that we apply to review of agency decisions. This is a deferential standard. In cases in which the court of appeals is not reviewing an agency decision directly, but instead is looking at a district court's conclusion about the agency's action, both courts review the entire record to see if it contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." See *Dilling Mechanical Contractors, Inc. v. NLRB*, 107 F.3d 521, 524 (7th Cir.1997) (quotations and citation omitted) (statement of standard); *Griffith v. Callahan*, 138 F.3d 1150, 1152 (7th Cir. 1998) (same standard for district court and court of appeals in Social Security appeals, which also go initially to the district court).

Our colleagues in the Fourth Circuit have suggested that there might be an even more deferential version of the substantial evidence standard that applies to this section of the Telecommunications Act, because it will often involve review of a city council's decision or that of another legislative body. See *AT & T Wireless PCS, Inc. v. City Council of the City of Virginia Beach*, 155 F.3d 423, 430 (4th Cir.1998). The "reasonable mind" of a legislator, the court suggested, might not be the same thing as the "reasonable mind" of a bureaucrat, and it is both natural and proper for legislators to weigh heavily the views of their constituents and even allow these views to "trump those of bureaucrats or experts." *Id.*

Taking *AT & T Wireless* as a whole, however, it is not at all clear that the statement to which we have just referred made any difference to the outcome. This court has expressed skepticism in the past about the ability of judges to apply more than a few standards of review. *United States v. Boyd*, 55 F.3d 239, 242 (7th Cir. 1995) ("[T]here are more verbal formulas

for the scope of appellate review ... than there are distinctions actually capable of being drawn in the practice of appellate review."). It is possible, though not always easy, to distinguish among *de novo* review, substantial evidence review, abuse of discretion review, and clear error review, but we believe there is nothing useful to be gained in attempting to subdivide any of these categories even further. Here, at least, there is no indication in the statute that Congress had any such thing in mind. Also, true as the *AT & T Wireless* observation may be about legislators, it overlooks the fact that municipal councils often wear several hats when they act. When they are passing ordinances or other laws, they are without a doubt legislators, but when they sit as an administrative body making decisions about zoning permits, they are like any other agency the state has created. We therefore apply the conventional substantial evidence standard to the case before us.

■ The record that the City compiled upon remand from the district court offered two ways of looking at the Air Page tower. One, the view Air Page urged, was that the marginal effects of the tower were minimal, and thus none of the City's three reasons for denying the permit were supported by substantial evidence. The proposed new tower would be only 40 feet, or 10%, higher than the old tower, not counting the antenna. While the base would nearly double, as an absolute matter it would change from 27 inches to 51 inches. For a structure located on a four-acre plot of land, Air Page argued, these changes mean nothing. Air Page also notes that it is entitled to keep repairing the old tower for·as long as it wants, unless the repairs exceed 50% of its value, and so there is no near-term prospect that the commercial use will vanish from the residential area. Last, Air Page pointed out that its proposed new tower would not only comply with current safety and engineering standards, but it would also furnish a better

signal to virtually all users of paging services in the area.

The City did not look at this as a marginal effects case. Instead, it took the position that the proposed expansion of the commercial use in the area would be unsightly and inconsistent with its R–1 residential zoning. To buttress the latter point, the City relied on an official policy set forth in a January 30, 1998, memorandum prepared by the City Administrator, stating:

(i) that no tower or similarly constructed structure shall be allowed in a residential area; (ii) that the master plan of the City and its included objectives shall be a guiding document when considering these requests; (iii) that the City will ensure that the structures are aesthetically acceptable for the affected neighborhoods; and (iv) applications seeking conditional use permits for tower construction will be treated in a consistent manner.

Although it had not put these standards into writing until after Air Page sought to build a replacement tower, the City's past practice of granting and denying permits demonstrated that it had been following this policy since as early as 1994.

The City found Air Page's proposed tower to be significantly different from the utility poles and easements that are permitted, and it frankly took aesthetics into account. Other evidence in the record indicated that the replacement of the existing tower with a new, modernized tower would affect property values in the area. Residents testified that they had moved into the area with the understanding that the present tower could only be maintained, not expanded or replaced. Moreover, the City had previously rejected proposals to build shorter towers in residential neighborhoods, and it believed that the approval of Air Page's new tower would represent a reversal of its policies about permits.

We cannot say that this decision was unsupported by substantial evidence.

Nothing in the Telecommunications Act forbids local authorities from applying general and nondiscriminatory standards derived from their zoning codes, and we note that aesthetic harmony is a prominent goal underlying almost every such code. By leaving most of the substantive authority to approve the location of personal wireless service facilities in the hands of state or local governments, Congress must have known that exactly the kind of decision the City of Delafield reached would occur from time to time. It chose to protect federal interests through two principal methods, one procedural and one substantive. The procedural method is the requirement for written findings, supported by substantial evidence in the written record—that is, the safeguard that the district court's first opinion in this case guaranteed. The substantive method is the nondiscrimination requirement to which we turn in a moment.

There may be other substantive protections as well, including an overall mandate not to reach a decision that *de facto* bans personal wireless service altogether from an area. See 47 U.S.C. § 332(c)(7)(B)(i)(II). This may not mean, however, that every municipality must have towers wherever anyone wants to put them. In many areas, such as the greater Chicago area in Northern Illinois, there are countless small suburbs with populations as low as 8,000 or 10,000 and areas of only a few square miles. They abut one another geographically, and in many instances they share public resources. We do not need to decide here how broad the duty is on any given municipal entity to ensure that wireless services remain available. Air Page concedes that it and its competitors will be able to continue providing service with the existing tower, albeit somewhat inferior service compared with what the proposed tower would make possible. The City's decision does not mean the end of wireless paging services in the Delafield area, and we therefore need not decide whether Delafield itself has the duty in its area to ensure that such a result does not come about.

■ Air Page also accuses the City of discriminating against it, in violation of 47 U.S.C. § 332(c)(7)(B)(i)(I). The evidence showed that the City had previously approved transmission facilities for Cellular One, Ameritech, Sprint, PrimeCo, and Nextel, all of which are providers of two-way cellular telephone service. The approved facilities, the City counters, were located in non-residential areas, and because cell phones use different transmission technology than pagers, they involved significantly shorter—and therefore less aesthetically displeasing—towers. Nonetheless, two-way cellular telephone service, Air Page argues, is "functionally equivalent" to one-way wireless paging, and thus the difference in treatment amounts to prohibited discrimination. Once again, we cannot agree.

Whether or not two services are "functionally equivalent" depends on what that phrase means, which raises a question of law. In our view, the phrase is reminiscent of the common question in antitrust cases whether two products are in the same relevant market. In each instance, the statute requires the decisionmaker to see if the two services (or products) are direct substitutes for one another and thus are in direct competition with one another. See also H.R. Conf. Rep. 104–458, at 208 (1996) (defining term to refer to services that directly compete against one another). In order to answer that question, it is common to compare the characteristics of the service or product, the price of each one, and the willingness consumers have shown to switch from one to the other when the price of one changes. Here, one is struck immediately by a number of salient differences between two-way cellular telephone service and one-way paging services, as each exists in the market today. First (and obviously), a cellular caller has an interactive and immediate conversation with the recipient of the call; there is no need to find a telephone, call back, or drive

to the caller in order to respond. Second, although prices for wireless telephone service have been falling lately, there is still a significant difference in price for paging services and cellular telephone service. Wireless telephones are simply a far more versatile product, and even though an increase in the price of paging services might cause a consumer to switch to a cellular telephone, this record does not show that an increase in the price of cellular telephone services would cause a consumer to switch to a pager. *Cf.* Richard A. Posner, *Antitrust Law: An Economic Perspective* at 128 (1976) (discussing the so-called "cellophane fallacy," resulting from the Supreme Court's failure in *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956), to recognize that cellophane's current price was above competitive levels and if du Pont were selling cellophane at a competitive price, there would be no similarly priced substitutes).

The two services are distinctive from another perspective as well. Because of the transmission technology cellular telephones use, they need a network of much shorter towers. Signals move across short distances, from one "cell" to the next. Paging services like Air Page's, in contrast, require a much taller tower. Granted, this difference does not affect the functional equivalence (or lack thereof) of the end-service each one offers. We could imagine, as these technologies develop, that two-way calling might be provided within a paging area through the use of tall towers, or that paging services might find a way to tap into cellular networks. In a dynamic sense, the two markets might even become one some day. The City of Delafield, however, was entitled to draw a distinction between a service that required a very tall tower in a residential community, and a service that could be delivered much less obtrusively.

In short, we agree with the district court that Air Page could not show that the City's decision violated the anti-discrimina-

tion rule of the Act, because there was no evidence that the City was giving preferential treatment to anyone who offered a service functionally equivalent to that of Air Page.

Some may disagree with Congress's decision to leave so much authority in the hands of state and local governments to affect the placement of the physical infrastructure of an important part of the nation's evolving telecommunications network. But that is what it did when it passed the Telecommunications Act of 1996, and it is not our job to second-guess that political decision. We therefore Affirm the judgment of the district court in favor of the City.