SPRINT SPECTRUM, L.P., d/b/a Sprint PCS, James T. Grosvenor and Sharon Grosvenor, Plaintiffs,

v.

BOARD OF COUNTY COMMISSIONERS OF JEFFERSON COUNTY, Colorado, and the County of Jefferson, State of Colorado, Defendants.

No. CIV.A. 97–WM–1246.

United States District Court,
D. Colorado.

Aug. 4, 1999.

James L. Kurtz–Phelan, Dean G. Panos, David Eason, Berenbaum, Weinshienk & Eason, P.C., Denver, CO, for Plaintiffs.

Frank Hutfless, Claire Levy, Jefferson County Attorney's Office, Golden, CO, for Defendants.

## ORDER ON CROSS–MOTIONS FOR SUMMARY JUDGMENT

MILLER, District Judge.

This case concerns the denial by the Board of County Commissioners of Jefferson County, Colorado (Board) of the plaintiffs' application for a special use permit for Sprint Spectrum, L.P. (Sprint) to locate a telecommunications pole on the property of plaintiffs James T. Grosvenor and Sharon Grosvenor (Grosvenors). The parties' cross-motions for summary judgment are before me. Those issues have been fully briefed and for the reasons discussed below, I will grant the defendants' motion and deny the plaintiffs' motion.

### Background

The Grosvenors own a ten-acre parcel of property in unincorporated Jefferson County, Colorado. The property is approximately one-third mile south of the Interstate 70 highway and approximately one mile west of the point at which the Interstate enters the foothills of the Rocky Mountains.

The property is zoned Agricultural–Two (A–2), wherein the first two permitted uses are "one-family dwelling" and "general farming." There are a variety of other permitted uses, which do not include a telecommunication tower or pole such as that sought here. Zoning Resolution for Jefferson County (1997) (Zoning Resolution), Sec. 31. The surrounding property is likewise zoned A–2 although some Residential Planned Development Districts have been established to the north and west of the property. With the exception of the two towers or poles described below, the use of the surrounding property is single family residential. Folder 1, p. 86.

There currently exists two poles on the Grosvenor property, each approximately 50—55 feet tall, along with some related equipment. One pole is operated by Air-Touch Cellular (AirTouch), and the other is owned by AT & T. Although the placement of such poles was not allowed as a matter of right under the then applicable county zoning regulations, both poles were allowed after the Board issued a special use permit for each before 1993.

Sprint, which competes with AirTouch and AT & T, desires to place its own facility on the property. Unlike its competitors, who provide cellular services using the older analog technology, Sprint's equipment uses the newer digital technology. Sprint needs to place equipment on the site to fill an approximate two-mile gap in its coverage along Interstate I–70, an area which is served by AirTouch and AT & T.

Sprint first approached AirTouch and AT & T about utilizing their existing equipment, but they refused. Sprint then leased some additional space on the Grosvenors' property. Sprint proposes the construction of a 65–foot monopole that Sprint calls a "stealth" pole. Because of intervening changes in zoning resolutions, Sprint could not erect its facility as a matter of right or pursuant to a special use permit as AirTouch and AT & T had.[1] Instead, it was required to apply to rezone part of the lot into a planned development district for telecommunication towers.

In October 1996 Sprint asked the Jefferson County Planning and Zoning Department for a pre-application review for a zoning change. A zoning case manager concluded that it conformed with the Jefferson County Comprehensive Plan and that it was compatible with existing and allowable land uses in the surrounding area. Folder 1, pp. 85—91.

The application was then submitted to the County's planning commission for re-view. In May 1997 the planning commission held a public hearing and took testimony from the County's Planning Staff, Sprint PCS, a representative of NexTel (a company that sought to utilize Sprint's facilities), and local residents. At conclusion of the hearing the planning commission voted, four to three, to recommend approval of Sprint's application and sent it along to the Board. Folder 1, p. 91.

The Board held hearings on the application on May 20 and June 3, 1997. At the conclusion of the June 3 hearing, the Board orally voted to deny the application. Before the meeting adjourned, the Board, at the suggestion of its attorney, directed the county attorney to prepare a written resolution to deny the application. Tr. Vol. II, p. 92. On June 17 the Board adopted a written resolution stating its reasons for denying the application. The June 17 resolution contained an error, however, and so on July 1 the Board adopted a corrected resolution. The resolution, in final form, is referred to as resolution CC97–255 (the Resolution).

On June 16, 1997, Sprint and the Grosvenors filed this lawsuit, claiming the Board's actions violated Section 704 of the Telecommunications Act of 1996 (TCA or Act), 47 U.S.C. § 332(c)(7), in denying Sprint's application for a special use permit.[2] The parties then filed cross motions for summary judgment.

*Standard of Review*

Summary judgment is appropriate if the movant demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Adler v. Wal–Mart Stores, Inc.,* 144 F.3d 664, 670 (10th Cir.1998). A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party" and material "if un-

---

1. The amended resolution limited such special use permits to a total of two within the lot. Sec. 2, N, 3.d. Zoning Resolution, App. 1, p. 11.

2. The plaintiffs also asserted two constitutional claims, however, the parties subsequently stipulated to dismissal of those claims. See order entered November 18, 1997.

der the substantive law it is essential to the proper disposition of the claim." *Adler,* 144 F.3d at 670 (citing *Anderson v. Liberty Lobby,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).

In their Cross Motions for Summary Judgment, all parties assert there is no genuine issue of material fact of the matters presented in the record. *See* Plaintiffs' Memorandum Brief in Support of Plaintiffs' Motion for Partial Summary Judgment, p. 26; Defendants' Answer Brief, p. 1. Each party urges, based on that record, that it is entitled tó judgment as a matter of law with, of course, diametrically opposing results.

Existing precedent indicates that these issues are appropriately decided by cross motions for summary judgment. *See, e.g., Sprint Spectrum, L.P. v. Willoth,* 176 F.3d 630, 634 (2d Cir.1999); *Town of Amherst, N.H. v. Omnipoint Communications Enter., Inc.,* 173 F.3d 9, 10 (1st Cir.1999).

### Discussion

The TCA reflects a national policy decision to deregulate the telecommunications industry and to encourage competition in order to enhance the industry's technological development. *Willoth,* 176 F.3d at 637. Part of that effort includes making local zoning decisions—a matter to which the federal courts have been extremely deferential—subject to federal judicial oversight under § 332(C)(7)(B)(v). *Cellular Telephone Company v. Town of Oyster Bay,* 166 F.3d 490, 493 (2d Cir.1999).

Indeed, the TCA places certain restrictions on, but does not preempt, the power of local regulatory bodies to control zoning decisions in relation to telecommunications services. *See* 47 U.S.C. § 332(c)(7)(A) ("Except as provided in this paragraph, nothing in this chapter shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construc-

tion, and modification of personal wireless service facilities"). It is a difficult balance to maintain local authority while serving potentially conflicting national policy.[3] The Act seeks that balance by recognizing local authority but ultimately making it subject to three limitations. The Act requires that any adverse decision be in writing and supported by "substantial evidence contained in a written record." § 332(c)(7)(B)(iii). Further, State or local government agencies may not "prohibit or have the effect of prohibiting the provision of personal wireless services" or "unreasonably discriminate among providers of functionally equivalent services." § 332(c)(7)(B)(i)(I) & (II).

The Plaintiffs allege the Board's action violated the Act in several ways. First, the Plaintiffs claim the Board failed to deny the application in writing as required. Secondly, they assert the denial was not supported by substantial evidence contained in the record. Third, the Plaintiffs contend that the Board effectively prohibited the provision of personal wireless services. Finally, the Plaintiffs argue that the Board unreasonably discriminated among Sprint and other providers of functionally equivalent services.

### A. *Written Decision*

Section 332(c)(7)(B)(iii) requires that any "decision by a ... local government ... to deny a request to place, construct, or modify personal wireless service facilities shall be in writing ...."

This writing requirement serves to provide the reviewing court with the rationale of the denial to allow the court to determine if the denial was lawful under the statute. *Western PCS II v. Extraterritorial Zoning Auth.,* 957 F.Supp. 1230 (D.N.M.1997). This should not require extensive findings of fact and conclusions of law as some suggest. *See AT & T Wireless PCS, Inc. v. City Council of the City*

---

**3.** "The [Act] was nothing if not a complex balancing act among conflicting interests. Not the least of these were the interests of state and local governments in continuing to regulate certain aspects of this industry, and the need for a uniform federal policy." *Aegerter v. City of Delafield,* 174 F.3d 886, 887 (7th Cir.1999).

*of Virginia Beach*, 155 F.3d 423, 429—30 (4th Cir.1998). The resolution here gives adequate notice of the decision's rationale.

■ Plaintiff argues that the June 3rd oral resolution was the final action and therefore violative of the Section. I disagree. The process of the deliberative body rendering a written opinion after an oral ruling is long standing. *See AT & T Wireless PCS, Inc. v. Winston–Salem Zoning Bd. of Adjustment*, 172 F.3d 307 (4th Cir.1999). Here the process was not unduly delayed (June 3rd oral resolution, June 17th written resolution and ultimate correction on July 1st), and I conclude the written resolution, as corrected, is the written decision to be reviewed in this case.

### B. *Substantial Evidence*

■ Section 332(c)(7)(B)(iii) of the Act requires that any denial be supported by "substantial evidence contained in a written record." The "written record" includes the applications, transcripts, exhibits and other matters considered by the Board. *See Winston–Salem*, 172 F.3d at 315; *Virginia Beach*, 155 F.3d at 430.

Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). Although this standard is deferential,[4] a district court may not blindly affirm a decision; it must instead scrutinize the entire record to determine if the claim is supported by substantial evidence and the law has been correctly applied. *Hogan v. Schweiker*, 532 F.Supp. 639, 642 (D.Colo.1982). For example, evidence is not substantial if it is overwhelmed by other evidence or if it is in reality mere conclusion. *Gossett v. Bowen*, 862 F.2d 802, 804—05 (10th Cir.1988).

4. This is also properly characterized as a review of an agency acting in a quasijudicial capacity, *see Omnipoint v. Zoning*, 181 F.3d 403, 405 (3rd Cir.1999), and not as a legislative act as some suggest, *see Virginia Beach*, 155 F.3d at 430—31. Such characterization

To decide whether substantial evidence exists to support the denial requires that I first resolve who has the burden of proof on this issue. Plaintiffs have assumed defendant has the "burden of showing that [its] decision is supported by substantial evidence." Plaintiffs' Response to Defendants' Cross Motion for Summary Judgment, page 13. Interestingly, defendants do not join issue on this important point. Although there is a split of authority, *see Oyster Bay*, 166 F.3d at 496—97, I conclude the better view is that the burden rests with the party seeking to overturn the decision. *Century Cellunet of S. Mich. v. City of Ferrysburg*, 993 F.Supp. 1072, 1077 (W.D.Mich.1997). That is consistent with the normal deference afforded such decisions. *Cellular Tel. Co. v. Zoning Bd. of Adjustment*, 24 F.Supp.2d 359, 366 (D.N.J.1998). Accordingly, it is the plaintiffs' burden to establish that the Board's decision is not supported by substantial evidence.

To make this evidentiary decision, one needs standards against which the evidence should be measured. These standards are found in the pertinent zoning resolutions extant at the time of Sprint's application. First is the County's Zoning Resolution, which provides that the criteria the Board may consider to determine whether or not to approve the request for rezoning include:

a. All impacts of the proposed use upon property in the surrounding area.

b. The availability and feasibility of methods of mitigating the negative impacts of the proposed use upon the surrounding area.

c. The compatibility of the proposed use with existing and allowable land uses in the surrounding area.

is consistent with Colorado law that rezoning or special use determination is a quasi-judicial proceeding, *see Snyder v. Lakewood*, 189 Colo. 421, 542 P.2d 371 (1975), which should be granted deference pursuant to the Act. *See* 47 U.S.C. § 332(c)(7)(A).

d. The degree of conformance to applicable land use plans.

\*    \*    \*    \*    \*    \*

Zoning Resolution, Section 15.C.3, at pp. 1—2.

These criteria are substantially restated in the specific provision of the Zoning Resolution applicable to planned developments for telecommunications facilities:

> In reviewing a proposal under this Section, the Planning Commission and the Board of County Commissioners shall consider the compatibility of the proposal with existing and allowed and uses in the surrounding area; the County's Comprehensive Plan including but not limited to the applicable community plan or the General Land Use Plan and the Telecommunications Land Use Plan, according to the priorities set forth in the plans; the Local Government Land Use Control Enabling Act; the provisions of section 30–28–115, C.R.S., and any other applicable law, adopted public policies or plans, or studies presented as part of the zoning case. The Board as the sole discretion to determine the weight, if any, to give to each of these factors.

Zoning Resolution, Section 15.F.2.a(1), at p. 9.

Specifically relevant to the issues here, the purpose of a planned development for telecommunication towers is "to minimize adverse visual effects of towers" and "to maximize the use of [a] tower in order to reduce the total number of towers needed . . . ." Zoning Resolution, Section 15.F.

Beyond the general Zoning Resolution, and as part of its comprehensive plan, on May 8, 1985, the County adopted a Telecommunication Land Use Plan (TLUP). The TLUP was amended in 1994 to include the Low–Power Mobile Radio Service Telecommunication Land Use Plan Addendum (Addendum). The TLUP expresses concern about visual impact of such towers. See TLUP, pp. 1, 16—21. In particular, the Addendum notes that, despite "enthusiastic response of Jefferson County citizens to low-power mobile radio service," those citizens voiced strong objections to

the visual impact "not only in zoned residential districts, but also in areas which are zoned as agricultural, but which are actually used as residential property." Addendum, Sec. II.E, p. 8. General policies for site selection are established, see Sec. III. pp. 13—16, with particular emphasis on visual impact because of the County's environment:

> The unique and diverse landscapes of Jefferson County are among its most valuable assets. Protecting these valuable assets will require that location and design of Low–Power Mobile Radio Service Telecommunication facilities be sensitive to the setting in which they are placed. This is especially true in the mountainous parts of Jefferson County, where homes may be oriented to capture significant views and where site distance is greater. Visual concern should include both those found on and off site. . . .

Addendum, Sec. IV, A., p. 17. Visual Impact Policies are then adopted for telecommunication facilities. See Addendum, Sec. IV, B., pp. 17–20.

Finally, the County adopted a Central Mountain's Community Plan (Community Plan) in 1994 which is directly applicable to the land in question here. Again, this Plan recognizes the importance of visual resources: "The views and openness are a very significant part of the area's quality of life." Community Plan, p. 15. To preserve those resources, particular mountain site design criteria were established, including those to maximize views, to locate structures to avoid significant public views, and to avoid silhouetting structures on top of ridges. Community Plan, page 51.

■ All of these resolutions or plans reflect public policy determinations of a permanent or general nature to be prospectively applied. Hence, they are legislative or quasi-legislative decisions by the Board of County Commissioners. *State Farm Mut. Auto. Ins. Co. v. City of Lakewood,* 788 P.2d 808, 813 (Colo.1990). With particular regard to the issues of this case,

Colorado has long recognized the exercise of police power through zoning regulation for the protection of mountain views is a legitimate governmental concern. *Landmark Land Co., Inc. v. City and County of Denver,* 728 P.2d 1281, 1285 (Colo.1986) ("It has been well established that protection of aesthetics is a legitimate function of a legislature"). For example, protection of aesthetic values by limiting utility construction is recognized as a legitimate legislative function in Colorado. *US West Communications, Inc. v. City of Longmont,* 924 P.2d 1071, 1084 (Colo.App.1995) (city ordinance requiring underground relocation of overhead communication facilities).

■ With these legislative policies providing context and standards, I address whether the Board's decision was supported by substantial evidence.

Turning to the Resolution, CC 97–255, it contains several findings that outline the basis for the Board's decision. Although the Board concluded that any particular finding would be by itself a sufficient basis to deny the application (Finding No. 8), two findings are particularly relevant: (1) the proposal was not in substantial conformance with the Community Plan and the TLUP (Finding No. 3); and (2) the proposal was not compatible with existing and allowable land uses in the area (Finding No. 4). Both of these findings are heavily reliant on view or visibility impacts.

The Board's finding that the proposal lacked substantial conformance with the Community Plan and the TLUP includes the failure to conform to the "visual impact mitigation requirements, the co-location requirements and the site selection criteria" (Finding No. 3). The Board concluded the monopole would be very visible above surrounding trees with a silhouetted structure that was not completely natural.

A review of the record discloses significant evidence of the visual impact of the proposed tower. It would be a taller, larger version of the two towers located on the adjacent tract. Drawings, photographs, computer generated photo simulations, and schematic drawings submitted by Sprint display the visual impact (*see* Folder 1, pp. 133, 136—38; (Folder 5, Exhibit 4), as do the photos submitted by citizenry (Folder 5, Exhibit 5). Numerous letters or petitions were received as well, most objecting to an alleged negative visual impact (see Folder 5). Several neighboring residents testified against the location. at the hearings with many expressing a belief that the tower will negatively impact property values and that there would be a tower proliferation into an "antenna farm." *See* Transcripts, Volume II, pp. 44—74).

Sprint's evidence in support of the rezoning is not only that the proposed location is the most feasible site for the purpose intended, but also that the County's own case manager and planning commission concluded that the proposed location conformed to the County plans for various reasons. These included the fact that the facility would be camouflaged and clustered to reduce the spread of further facilities. Rec., pp. 85—91. Sprint's efforts ultimately included reducing the pole height from 77 feet to 65 feet. Sprint also submitted a Real Estate Value Impact Study, prepared by an MAI appraiser, that concluded that the location of a telecommunication monopole did not adversely affect property values. In general, Sprint claims that the Board over-emphasized visual issues to the exclusion of other legitimate considerations in zoning decision making.

My task is not to decide which of these competing views should prevail. Certainly the evidence may well justify the granting of plaintiff's request. Nevertheless, my job is to determine whether there is sufficient competent evidence so that a reasonable mind might accept it as adequate to support the Board's conclusion, not mine. *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). I do not decide that the Board was right. *Presbyterian/St. Luke's Medical Ctr. v.*

*NLRB,* 723 F.2d 1468, 1471 (10th Cir. 1983).

Generally, unsupported assertions or conclusions are not substantial evidence. Such are the conclusory claims here concerning the alleged negative impact on property values. They are assertions without adequate evidentiary support and do not qualify as substantial evidence. See *Oyster Bay,* 166 F.3d at 496. Whether impairment of view impacts market value is subject to legitimate debate. *See LaPlata Elec. Ass'n, Inc. v. Cummins,* 728 P.2d 696 (Colo.1986) (landowner may be entitled to compensation for view impairment to his property's residue when subject to a partial taking while those whose property is not taken may have no such claim). Although a landowner may testify as to property value without being qualified as an appraisal expert, *Baker Metro. Water and Sanitation Dist. v. Baca,* 138 Colo. 239, 331 P.2d 511 (1958), his or her testimony is still not admitted if not reasonably based on facts or experience. *Pomeranz v. McDonald's Corp.,* 843 P.2d 1378, 1383—84 (Colo.1993). Here the testimony is conclusory.[5]

Defendants also discounted the plaintiffs' valuation study, essentially arguing that it concerned circumstances and property which were not comparable to the issues presented in Jefferson County. Those may be legitimate considerations[6], but they go only to the weight of the evidence. Regardless, the weakness of the plaintiffs' evidence does not provide substantial evidence for the County's bald conclusion that there is an adverse impact on property values.

Likewise, to the extent any of the County's conclusions are based upon a fear that even more towers may be installed represents mere speculation only, not competent

evidence. The citizens may fear an "antenna farm," but there was no evidence of any other pending application for a tower site in the vicinity.

On the other hand, plaintiffs have failed to meet their burden of proving that there was no substantial evidence to sustain the Board's decision concerning visual impact. As noted, there is substantial evidence in the form of pictures, drawings and testimony that the location does have an impact on views or visibility. The proposed monopole, even though shortened and camouflaged, and its accompanying antenna are plainly noticeable as they are taller than the surrounding trees and existing poles. The Board could well conclude the impact was adverse and violative of well-established policies of preserving open views as a significant aspect of the mountain area and its quality of life. Recognition of such an aesthetic value as a valid basis for zoning decisions is well established in Colorado. *Landmark Land Co.,* 728 P.2d at 1285—86. The TCA does not forbid such considerations by the local government. Indeed, Congress must have anticipated such decisions based on local aesthetic goals. *Aegerter v. City of Delafield,* 174 F.3d 886, 891 (7th Cir.1999) ("aesthetic harmony is a prominent goal underlying almost every [zoning] code"). Rather than ruling out local decisions, Congress chose to protect the federal interests through the procedural (written decision supported by substantial evidence) and substantive (preserving services without discrimination) requirements. *Id.* Sprint plainly believes its location is the best for many reasons, including aesthetics. However, subject to the mentioned protections, "such choices are just what Congress has reserved to the [local author-

---

**5.** One nearby resident testified that he negotiated a reduction in his purchase price because of a view of the poles, but that is unconfirmed and unrelated to any sort of a market price comparison. Another, after noting that she could not see the towers from her residence and that property values are depressed because of noise from 1–70, still concluded the tower would impact the value of her property. Testimony of Tafoya, Tr., Vol. II, pp. 63–64.

**6.** The special purpose of maintaining views in the arid Rocky Mountain West may be distinguishable from the stereotypical, land-of-a-thousand lakes Minnesota.

ity]." *Amherst*, 173 F.3d at 15. Balancing local autonomy with certain federal limitations may not be easy:

> "But Congress conceived that this court would produce (albeit at some cost and delay for the carriers) individual solutions *best adopted to the needs and desires of the particular communities.* If this refreshing expenence in federalism does not work, Congress can always alter the law."

*Id.* at 17 (emphasis added).

In sum, preservation of local aesthetics remains a matter of local regulation, and substantial evidence exits to justify the Board's decision on the view issues in this case. *See Willoth*, 176 F.3d at 639 & 645 (the Act's goals of increased competition and rapid development do not trump preservation of local autonomy in the regulation of aesthetics).

I also find that plaintiffs have not proved that, on balance, the Board's fourth finding, that the proposed tower is incompatible with existing and allowable land uses, is not supported by substantial evidence. Certainly there is substantial evidence of compatibility, most notably the recommendations of the County planner and the Planning Commission that the proposal, with modifications, is compatible. Folder 1, page 91. Of course, those recommendations are not binding upon the Board, and it concluded otherwise.[7] See *Meyer v. Buffalo Park Dev. Co.*, 44 Colo. App. 52, 607 P.2d 401 (1980).

The evidence described above provides evidentiary support of the Board's conclusion of an adverse visual impact beyond the existing towers. Further, the record discloses that A-2 zoned property, such as this, permits only the location of two tow-

ers no higher than thirty-five feet by means of a special use permit. See Zoning Resolution, Sec. 31B16(f). Accordingly, a third, much taller tower would not be compatible with allowable land uses in the A-2 zone. In addition, the principle use of the surrounding area is single family residential use with the exception of the existing facilities. Folder 1, page 86. Remembering that the concern with visual impact relates not only to residentially zoned districts but also to agriculture zones that are actually used as residential property (Addendum, Sec. IIE, page 8), there is evidence that the proposed use would not be compatible with existing and allowable uses.

There exists substantial evidence for the Board reasonably to conclude that the proposed tower is not consistent with the predominant residential character of the area.

### C. *Prohibition*

■ My conclusion that the Board's decision was based on substantial evidence does not immunize the decision from attack for violating the antidiscrimination and antiprohibition provisions of the Act. *Amherst*, 173 F.3d at 14.

Turning first to the issue of whether the decision prohibited or has the effect of prohibiting wireless services, the record discloses that the County has no general ban or blanket prohibition as Sprint itself already has two or more facilities located within the County as do other suppliers (AT & T and AirTouch). Although some courts have concluded that Subsection B(i)(II) applies only to such general bans, *see Virginia Beach*, 155 F.3d at 428, the better view is that where local policies or

---

7. The planner and the Planning Commission found compatibility "because the facility will be designed to emulate the appearance of an evergreen tree, it will placed in an area that has vegetative cover and has a mountain backdrop, and it will have minimal visible impacts to the surrounding area." Folder 1, page 91. The Board disagreed, concluding that the "monopole will be very visible, extending above the level of surrounding trees

[and] will be silhouetted when viewed from the surrounding area and will not have a completely natural appearance." Board Resolution, Finding 3. The Board also concluded that the "visibility of this proposal at this site will create a concentration of non-residential uses in close physical and visual proximity to existing residences ..." Board Resolution, Finding 4.

attitudes have the effect of prohibiting personal wireless services, the statute is also violated even though there is no express prohibition. *Amherst,* 173 F.3d at 14. That is the issue presented here. Plaintiffs contend that, absent the proposed site or some substitute, Sprint is effectively banned from providing coverage along the two-mile gap.

It is essentially undisputed that the proposed location may be the only site where a single pole will remedy this gap. See testimony of Linda Augustine, Volume II, pp. 9–10. The record suggests, but is not clear, that there are other sites which may require only one pole but those sites were not available at the time of the application for various reasons.[8] Regardless, for purposes of this decision, I assume, without knowing, that Sprint's only alternative to this single pole site is to place two or more towers at alternative locations.[9] Certainly, increasing the number of sites suggests a concomitant increase in visual and other environmental impacts, including any necessary utilities and roads.[10] Also, service from the alternative sites may be less than optimal (Volume I, page 15). Accordingly, the record demonstrates that the proposed location is the preferred and most feasible. Again, however, that is not the question presented. The issue is whether forcing Sprint to use lesser alternatives constitutes a prohibition. I think not.

First of all, a legitimate zoning decision which may frustrate the provider's coverage goals is not automatically an unlawful prohibition. The law's apparent goal of balancing local autonomy with the stated policies furthering telecommunications may well result in gaps in service or other service that is less than optimal. The dis-

trict court in *Cellular Tel. Co.,* 24 F.Supp 2d at 373 stated:

> Were courts to hold that merely because there are some gaps in wireless service in an area . . ., the public interest *necessarily* tips the balance in favor of allowing a variance, local boards would be obliged to approve virtually every application which would improve service, without regard to its impact on the surrounding areas. That simply cannot be the case. Such a result would vitiate state land use law and render irrelevant the factors considered in a variance application.

(Emphasis in the original).

Congress's protection against bans does not mean that every locality must accept towers that provide superior service. *Aegerter,* 174 F.3d at 891. Congress must have known that occasionally such decisions would result from allowing local authorities to consider matters other than optimal end of service. *Id.*

The Board's decision does not necessarily imply that future applications will be denied at other locations. It would not be unreasonable for the County to decide that the alternative locations with more towers are acceptable even though there may be on balance more total environmental impact. Many different factors could come into play and one can project that local authorities may give weight to considerations that are not relevant to the provider's determination of feasibility. The *Amherst* court noted "the realm of tradeoffs":

> On one side are the opportunity for the carrier to save costs, pay more to the town and reduce the number of towers; on the other are more costs, more tow-

---

8. Plaintiffs' testimony indicates other possible locations which were not used either because they doubted the land owner would agree or because the land owner rejected plaintiffs' approaches. Testimony of Gary Pultz, Volume II, pp. 14–15.

9. *Sprint's* Ms. Augustine was unequivocal: "If Sprint PCS does not develop this facility at the Grosvenor's ridge location, we will

have to develop two or three other PCS facilities in this area." Volume II, page 11. Defendant does not expressly challenge this conclusion.

10. Sprint's Gary Pultz stated that "[Sprint] will need to do at least two sites. That means twice as much impact on the community." (Volume II, page 81).

ers, but possibly less offensive sites and somewhat shorter towers. Omnipoint may think that even from an aesthetic stand point, its solution is best. But subject to an outer limit, such choices are just what Congress has reserved to the town.

*Amherst,* 173 F.3d at 15.

Under the legislative policies of today, an increased number of facilities, and, hence, increased visual impact, is the inevitable result of the Act's encouragement of competition. See § 332(A)(3). Current policy is in sharp contrast to the preexisting doctrine of regulated monopoly, the antithesis to outright competition. One justification of regulated monopoly was to avoid unnecessary duplication of facilities. *Western Colo. Power Co. v. Public Util. Comm'n,* 159 Colo. 262, 411 P.2d 785 (1966) (Regulated Monopoly "was designed to prevent duplication of facilities and competition between utilities ...."). Multiplication of facilities, as demonstrated by the record of this case where three providers seek to locate within a few feet of one another, is a likely corollary of encouraged competition. Accordingly, the fact there will be more facilities does not necessitate disapproval of alternative locations.

I conclude that the Board's decision neither was a general ban nor had the effect of a ban on Sprint's providing service.

### D. *Discrimination*

Pointing to the AirTouch and AT & T towers previously approved by the Board, the plaintiffs allege unreasonable discrimination in violation of Sec. 332(c)(7)(B)(i)(*l* ). It is "unreasonable discrimination" that is prohibited, not differences made on a rational basis. The Act does not forbid "local authorities from applying general and non-discriminatory standards derived from their zoning codes..." *Aegerter,* 174 F.3d at 891. I conclude that such non-discriminatory distinctions were drawn in this case.

The applications and approval of the AT & T and AirTouch facility were under much different circumstances. As previously described, both were granted special uses under a different set of zoning resolutions. It was after those facilities were approved, but before Sprint submitted its application, that the County amended its plans to more specifically address telecommunication facilities. This included size limitations and the limitation of two facilities per lot. As a consequence, Sprint was forced to seek an amendment to the zoning resolution rather than the less demanding special use review. The factors considered in decision making process for the Sprint application differed from AT & T and AirTouch, but the differences were based on legitimate distinctions which were applied in a non-discriminatory fashion.

There is no evidence that the County considered inappropriate factors such as the Board favoring one supplier over the other. The fact that circumstances occurred in the past which gave the first competitor some advantage does not require that a subsequent competitor be afforded the same advantage in disregard of new local zoning rules.

I conclude the Board's decision did not violate the unfair competition provision of the Telecommunications Act.

It is therefore ordered that:

1. Defendants' Motion for Summary Judgment is granted;

2. Plaintiffs' Motion for Partial Summary Judgment is denied;

3. Plaintiffs' Complaint shall be dismissed with prejudice; and

4. The parties shall pay their own costs.