**PRIMECO PERSONAL COMMUNICATIONS, LIMITED PARTNERSHIP, d/b/a Verizon Wireless, Plaintiff,**

v.

**CITY OF MEQUON, Defendant.**

**No. 01–C–1205.**

United States District Court,
E.D. Wisconsin.

Jan. 27, 2003.

---

Gary A. Ahrens, Katherine W. Schill, for Plaintiff or Petitioner.

Raymond J. Pollen, Ryan G. Braithwaite, for Defendant or Respondent.

### DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Verizon Wireless ("Verizon"), a provider of personal wireless telephone service, brings this action against defendant, the City of Mequon ("City"), under the Telecommunications Act of 1996, 47 U.S.C. § 332(c)(7)(B)(v) ("TCA"), and 42 U.S.C. § 1983. Verizon alleges that the City's denial of its application for a conditional use permit to construct a personal wireless service facility violated the TCA because it was not supported by substantial evidence. Before me now are the parties' cross-motions for summary judgment.

## I.  BACKGROUND

### A.  Wireless Service Facilities

Wireless communication facilities allow cellular phones, pagers and wireless faxes to work. Such facilities include towers, poles, antennas or other structures used to transmit or receive radio or television signals, or any other spectrum-based transmissions/receptions. Antennas placed within a defined area comprise a cellular system, and the number and location of antennas within a given area directly affect the service available to cellular customers. Telecommunications companies provide wireless service to the public by initially carving service areas into cells. Each cell contains at least one cellular antenna. Where there are no existing structures high enough to accommodate an antenna, telecommunications companies must build tower structures. Shannon L. Lopata, *Note, Monumental Changes: Stalling Tactics and Moratoria on Cellular Tower Siting,* 77 Wash. U. L.Q. 193, 196–97 (1999).

### B.  Evidence Relevant to City's Decision

On November 3, 2000, Verizon applied to the City Planning Commission ("Commission") for a conditional use permit to construct a flagpole antenna at the Beautiful Savior Lutheran Church ("Beautiful Savior"), a nine acre property, which was zoned institutional. A flagpole antenna is known as a stealth design because the purpose of the flagpole is to hide the antenna. At the Commission's request, the height of the proposed flagpole was reduced from one hundred feet to seventy feet and the diameter from twenty-four inches to nine and one-half inches. The

flagpole was to be located at the back of the church parking lot.

The Commission delayed consideration of Verizon's application while the City enacted an amendment ("wireless facility amendment") relating to the siting of wireless service facilities to its zoning ordinance. Enacted on March 13, 2001, the amendment permits a facility to be sited in a residentially or institutionally zoned area only if no alternative site is "available" for co-location (locating multiple antennas on a single structure), and the proposed location is "necessary to comply with the 1996 Telecommunications Act and subsequent case law interpreting the Act." Mequon, Wis., Ordinances §§ 3.166(6)(a)a & 3.166(6)(b) (found at Schill Decl. Ex. G at 147). Almost all of the City is zoned residential.

Early in the process, the Commission suggested that Verizon locate the antenna at one of two alternative sites—North Shore County Club ("North Shore") or Homestead High School ("Homestead"). On March 19, 2001, Tim Klingman of Verizon advised the Commission that Verizon had examined the possibility of co-locating at the tower at North Shore and determined that the "site is too close to other sites in the network." (Klingman Decl. Ex. B at 2.)

On April 2, 2001, the Commission held a hearing on Verizon's application. Klingman testified that neither of the alternative sites proposed by the Commission would provide the necessary coverage, and that under the City's zoning code there was no other suitable place nearby. Four persons testified against Verizon's proposal. Clifford Pukaite stated that he opposed permitting commercial property in residential areas. Alderman Roger Reinemann testified that the applicant should be required to meet the criteria of the wireless facility amendment and demonstrate that alternative locations were unavailable.

Mark Koerner stated that he considered the project visually unappealing and thought that it might involve health risks. Darrell Laux testified that he did not support the project.

Subsequently, pursuant to the wireless facility amendment, the Commission hired, at Verizon's expense, an independent expert, B. Benjamin Evans of Evans Associates Consulting Engineers ("Evans"), to evaluate Verizon's application. On May 21, 2001, Evans completed a report on the Verizon proposal and recommended:

the approval of the proposed site at the requested height above ground of 70 feet.... Because of the "stealth" nature of the proposed structure, being disguised as a flagpole, and the height being less than other PSC towers, in addition to the fact that many mature trees will help screen the pole from many viewing directions, the visual impact, in the opinion of this engineer, would be moderate at best.

(Schill Decl. Ex. C at 9.)

Concerning the availability of alternative sites, the report stated that:

"The applicant has investigated the use or rebuild of the wireless tower at North Shore Country Club. However, this site is too close to another network site, about one mile southeast of the country club site, to be of practical benefit. Another alternative mentioned is to erect a tower disguised as a light standard at Homestead High School. However, this site is too close to yet another network site.

Figures 4 and 5 show the service areas that would result from locating PSC antennas at North Shore Country Club and at Homestead. It can be seen that locating at either of these sites to a large extent duplicates the coverage of an adjacent site and thus does not achieve the objective of this phase of the

network development, which is to provide the maximum fill-in for the existing network."

(*Id.* at 8.)

Finally, the report stated that:

A propagation study conducted by Verizon and verified by this engineer, shows convincingly that the area along Mequon Road has an unacceptably low level of PCS phone service, which can result in dropped calls.

(*Id.* at 9.)

In a June 5, 2001 letter, Evans advised the Commission of some of the intricacies of evaluating cell sites that would not be readily apparent to laypersons:

[T]he maps represent 'talk-out' only, that is, the level of signal received by the wireless phone from the cell site. There are many other factors that go into the evaluation of any given site: (1) 'Talk in,' the ability of a portable phone inside a car to contact the cell site to place a call. (2) 'Shadowing,' the effect of geography, trees, and structures in the line-of-sight path. (3) 'Interference,' whereby one site on the network interferes with another one, even though the propagation map shows that there is coverage. (4) 'CDMA' issues for digital phones, whereby a nearby site 'captures' a handset and does not allow it to hand off smoothly to another site. It is not certainly possible to fully evaluate a site entirely by the low-resolution, 4 color 'talk-out' map alone. It is certainly not possible for persons who are not trained in the technology to make a site analysis on this basis.

(Schill Decl. Ex. C at 1.)

He concluded that:

We respectfully disagree with the assertion that coverage from a co-located facility at the North Shore Country club antenna site would not be significantly different from that of the planned 70-foot flagpole at Beautiful Savior. We do not recommend the use of the country club site because the Beautiful Savior location, unlike the country club site, is equally distant from the most significant three other adjacent network sites. This location would be the least likely to suffer from interference, and the talk-in and talk-out are nicely mapped.

(*Id.* at 2.)

On June 18, 2001, the Commission held another hearing on Verizon's proposal. Klingman testified that the stealth facility would have little visual impact and, because Verizon had agreed to demolish a garage on the church property and rebuild it with a lannon stone exterior to match that of the church, the project would improve the appearance of the church grounds. Alderman Reinemann testified that he opposed locating wireless facilities in residential areas. Gerry Nagel supported the proposal. He stated that the flagpole would be only nine inches around and not unsightly, that it would be over three hundred feet from the road and probably not visible from the street because it would be blocked by trees. Reverend Hildebrandt, the pastor of Beautiful Savior, also supported the site, stating that when he was approached by Verizon he had concerns about the aesthetics of the proposal but was directed to look at a site in Waukesha County where a similar flagpole was erected. He stated that he found the flagpole aesthetically pleasing and did not believe that the church was compromising its community mindedness by permitting the site.

Evans testified that the site would be the least visually intrusive, that it was reasonable and prudent and that he recommended it without modification. He stated that the antennas would be hidden inside the flagpole behind fiberglass, and the pole would be screened by mature trees. He also stated that he had verified Verizon's

propagation map showing that the area along Mequon Road between Cedarburg and Port Washington Roads was a highly traveled road that had a low level of wireless phone service. He testified that the North Shore and Homestead sites were not technologically feasible because they were "too close to existing network sites. Coverage would be duplicated to a large extent and interference problems would be expected." (Schill Decl. Ex. A at 19.)

In a July 25, 2001 letter, Todd Amstadt of Verizon further advised the Commission regarding the alternative sites, stating:

> [W]hen sites are located too close to one another or 'off grid' the system is degraded. Many negative impacts result from moving sites too far 'off grid.' They include increased interference, poor voice quality, reduced system capacity and dropped calls, not only in the area near the properly located site but in other areas of the network, which the improperly located site impacts.

(Schill Decl. Ex. B at 34.)

On August 3, 2001, Evans completed another report. In the report he stated that a Grade B service level was required to provide adequate wireless phone service and that the Beautiful Savior site would cover 94.8 percent of the targeted area at the Grade B level, whereas the Homestead site would cover 71.5 percent and the North Shore site 72.1 percent.

The Commission met again on August 6, 2001. Evans testified that the Beautiful Savior site was far superior to the alternatives. He testified that locating the facility either at North Shore or Homestead would not be "good engineering." (Schill Decl. Ex. B at 34.)

Amstadt testified that Verizon's network presently covered only about thirty-seven percent of the targeted area. He stated that Verizon would not use the North Shore and Homestead sites because other areas would be "negatively affected by that move." (Schill Decl. Ex. B. at 15.) He stated that there was a large area to the northeast of the targeted area that was unserved, and that putting sites where they were not needed created a severe overlap in coverage and did not solve any problems. The effect would be to create sites too close to one another, which would "generate interference in other areas. We compromise other areas of the network by having these sites too close to one another. That's why, again, we have chosen Beautiful Savior because its basically between and covers the hole between all the other sites." (*Id.* at 32–33.)

Alderman Reinemann again testified, stating that this was the first wireless decision under the amendment to the zoning ordinance, and that if the application was approved "we will have wireless towers in residential areas all over Mequon." (*Id.* at 38.) The Mayor stated that she had received a petition from forty-five Mequon citizens supporting Verizon's request, and that she assumed that the signatures were those of church members.

At the close of the hearing, Commissioner Ridley moved that Verizon's request be denied "because there are other alternative sites which would provide adequate service and those sites would better adhere to our ordinances." (*Id.* at 41.) To this motion, Mayor Nuernberg added "being less intrusive." *Id.* The Commission passed the motion unanimously.

In a September 7, 2001 letter, the Mequon City Attorney advised Verizon that the denial of its application was based on the Commission's conclusion that it was "possible in this case to follow the ordinance's requirement to locate at an alternative site." (Schill Decl. Ex. H at 3.)

On September 12, 2001, Verizon appealed the decision of the Commission to the City's Board of Appeals, and on November

27, 2001, the Board denied Verizon's appeal.

## II. APPLICABLE LEGAL STANDARDS

### A. Jurisdiction

■ I have jurisdiction over this action based on 47 U.S.C. § 332(c)(7)(B)(v), which permits unsuccessful applicants for permits for wireless facilities to bring actions "in any court of competent jurisdiction." For purposes of review under § 332(c)(7)(B)(v), federal district courts are courts of competent jurisdiction. *See Telespectrum, Inc. v. Pub. Serv. Comm'n of Ky.*, 227 F.3d 414, 421 (6th Cir.2000) (holding that the reference to "any court" encompasses both state and federal courts); *see also Aegerter v. City of Delafield, Wis.*, 174 F.3d 886 (7th Cir.1999) (reviewing legality under TCA of local governmental decision to deny permit).

### B. Summary Judgment Motions Unnecessary

■ Plaintiff and defendant bring cross-motions for summary judgment under Fed.R.Civ.P. 56. I conclude, however, that in cases involving review of municipal decisions under the TCA, summary judgment motions are cumbersome and unnecessary. In such cases, district courts sit in an appellate capacity, much as in Social Security cases where they review the decisions of administrative law judges. *See* 42 U.S.C. § 405(g). The purpose of a summary judgment motion is to determine whether a case should proceed to trial, but in cases where courts review the decisions of other bodies the "trial" has already taken place. Further, in the present case, the standard of review is not whether there is a genuine issue of material fact, as it is under Rule 56, but, rather, whether the City's decision was "supported by substantial evidence." § 332(c)(7)(B)(iii); *see also Hamilton v. Sec'y of Health & Hu-*

*man Servs.*, 961 F.2d 1495, 1501 (10th Cir.1992) (Kane, J., concurring) (pointing out that summary judgment motions in social security cases are unnecessary for the reasons that I have stated); *Vaile v. Chater*, 916 F.Supp. 821, 823 n. 2 (N.D.Ill. 1996).

It may be that when a district court serves an appellate function the Federal Rules of Civil Procedure do not provide an appropriate vehicle for challenging the agency's decision. Nevertheless, I believe that a simple motion stating the relief requested should be sufficient. I will, therefore, treat Verizon's submission as a motion for an order reversing the City's decision, and the City's cross-motion as a request for an affirmance.

### C. The TCA

The purpose of the TCA is "[t]o promote competition and reduce regulation in order to secure lower prices and higher quality service for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104–104, preamble, 110 Stat. 56. "The legislative history evidences clear congressional intent to take 'down the barriers' to telecommunications." *Sprint Spectrum L.P. v. Town of Easton*, 982 F.Supp. 47, 50 (D.Mass.1997). With respect to the siting of wireless facilities, deregulation involved the dismantling of some but not all state and local regulation. The TCA represents an attempt to balance the need for a uniform federal policy of deploying private sector telecommunications technology and the interests of state and local governments in continuing to regulate the siting of telecommunications facilities. *Aegerter*, 174 F.3d at 887.

In order to ensure that development of telecommunications technology was not un-

reasonably fettered, the TCA imposed both substantive and procedural limits on municipal decisions regarding the siting of wireless service facilities. The substantive requirements are: (1) that local regulation shall not unreasonably discriminate among providers; (2) that it shall not prohibit or have the effect of prohibiting wireless service; and (3) that it cannot be based on the environmental and health effects of radio frequency emissions if the facility complies with relevant FCC regulations. § 332(c)(7)(B). The procedural requirements are: (1) that a local government must act on a siting decision within a reasonable period of time; and (2) that siting decisions be in writing and supported by substantial evidence contained in a written record. *Id.* The Seventh Circuit has interpreted these limitations as "leaving most of the substantive authority to approve the location of personal wireless service facilities in the hands of state or local governments." *Aegerter,* 174 F.3d at 891.

### D. Substantial Evidence Standard

With respect to the requirement that a municipal decision denying an application for a site be supported by substantial evidence, in the Seventh Circuit the term "substantial evidence" is given its common meaning. *Id.* at 889. The standard is the same as that applied by federal courts when they review agency decisions. It is a deferential standard and requires courts to review the record in order to determine whether it contains " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Id.* (quoting *Dilling Mech. Contractors, Inc. v. NLRB,* 107 F.3d 521, 524 (7th Cir.1997)). A district court must consider the record in its entirety and take account of the evidence unfavorable to the agency's decision. *See Am. Textile Mfrs. Inst., Inc. v. Donovan,* 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981).

The Seventh Circuit has not yet determined whether the local zoning authority bears the burden of proving that its decision is supported by substantial evidence or whether the burden of proof rests with the party seeking to overturn the decision. Other federal courts are split on the question. *See Cellular Tel. Co. v. Town of Oyster Bay,* 166 F.3d 490, 496–97 (2d Cir.1999) (noting split among district courts but declining to decide issue). Judge Crabb, in the Western District of Wisconsin, has concluded that the burden of proof rests with the party seeking to overturn the decision. She reasons that this is the traditional allocation, and that it is consistent with the deferential standard afforded to agency decisions and with the Seventh Circuit's approval of the conventional substantial evidence standard. *APT Minneapolis, Inc. v. Eau Claire County,* 80 F.Supp.2d 1014, 1022 (W.D.Wis.1999). At least one circuit court agrees with this view. *See S.W. Bell Mobile Sys., Inc. v. Todd,* 244 F.3d 51, 63 (1st Cir.2001) (holding that traditional allocation of burden of proof to the party challenging the decisions applies to decisions under the TCA). I agree with Judge Crabb's reasoning and, therefore, allocate the burden of proving that the City's decision was not based on substantial evidence to Verizon.

Although the TCA specifies how much evidence must be in the record for a municipality's denial of an application for a wireless facility to be upheld, the statute supplies no substantive criteria for municipalities to apply. *Cellular Tel. Co.,* 166 F.3d at 495. Such criteria are provided by state and local law. *Id.* The reviewing court's task is to determine whether the decision, as guided by local law, is supported by substantial evidence. *Cellular Tel. Co. v. Zoning Bd. of Adjustment of the Borough of Ho–Ho–Kus,* 197 F.3d 64, 72 (3d Cir.1999). However, the legislative

history of the TCA and the substantive and procedural limitations that it imposes on local decision-making suggest that Congress anticipated that in ruling on applications to site wireless facilities, municipalities would apply traditional zoning principles. Stephanie E. Niehaus, *Note, Bridging the Significant Gap: To What Extent Does the Telecommunications Act of 1996 Contemplate Seamless Service,* 77 Notre Dame L.Rev. 641, 656 (2002) (citing H.R. Conf. Rep. No. 104–458 at 208 (1996)).

### E. Requirements of Mequon's Zoning Ordinance

■ Under the City's zoning ordinance, wireless facilities in zoning districts other than floodways or wetlands are conditional uses. Under Wisconsin law, a conditional use is one that it not inherently incompatible with a particular area, but which might create problems if permitted to locate there as a matter of right. *Skelly Oil Co. v. City of Delafield,* 58 Wis.2d 695, 700–01, 207 N.W.2d 585 (1973).

■ Zoning ordinances that rely on the conditional use mechanism retain the usual residential, commercial and industrial zones specifying the uses permitted in each zone, and, in addition, establish conditional uses for each zone, which are permitted within the zone only if approved by the local governmental body. In other words, a conditional use permit allows property to be put to a purpose that the zoning ordinance conditionally allows. 8 Eugene McQuillin, *The Law of Municipal Corporations* § 25.159 (3d ed.2000).

For purposes of determining whether the City's decision was supported by substantial evidence, several provisions of the City's zoning ordinance are relevant. First, the wireless facility amendment to the ordinance provides that such facilities may be sited in areas zoned residential or institutional only if no alternative is "available" for co-location, and the proposed location is "necessary to comply with the 1996 Telecommunications Act and subsequent case law interpreting the Act." Mequon, Wis., Ordinances §§ 3.166(6)(a)a & 3.166(6)(b) (found at Schill Decl. Ex. G at 147).

Second, the amendment provides that applications for wireless facilities are "subject to the general conditional use requirements contained in section 3.05" of the ordinance. § 3.166(5) (found at Schill Decl. Ex. G at 146). One such requirement is that the Commission may not deny an application for a conditional use unless it concludes that the proposed use:

> would likely: Materially endanger the public health, general welfare, and safety, or substantially injure the value of adjoining or abutting property, or be inharmonious with the area in which it is to be located, or will not be in general conformity with the Land Use Plan, Transportation Plan, Environmental Plan, Park and Recreational Plan, or other officially adopted plan.

(Schill Decl. Ex. G at 26.)

### III. WAS THE CITY'S DECISION SUPPORTED BY SUBSTANTIAL EVIDENCE?

### A. Were Adequate Alternative Sites Available?

■ The Commission denied Verizon's application based on its conclusion that alternative sites were available and that it was, therefore, "possible in this case to follow the ordinance requirements to locate at an alternative site." (Schill Decl. Ex. H at 3.) I now turn to the question of whether this determination was based on substantial evidence.

Considerable evidence was presented on the question of whether the North Shore and Homestead sites were technologically

feasible alternatives to the Beautiful Savior site. All of the evidence introduced indicated that neither site constituted an adequate alternative. No evidence was offered that the sites were technologically feasible.

On March 19, 2001, Klingman advised the Commission that the North Shore site would not work because it was too close to other sites in Verizon's network. On April 2, 2001, he testified that neither the North Shore nor Homestead site would provide the necessary coverage.

In his May 21 report, Evans agreed with Klingman's conclusion that the North Shore and Homestead sites were inadequate. He stated that both sites were too close to other sites in Verizon's network and both duplicated coverage of adjacent sites and did not achieve sufficient coverage of the area that was unserved.

In a June 5, 2001 letter, Evans expanded on the technological problems with the North Shore and Homestead sites. He stated that because these sites would be too close to other sites, they would cause interference. He stated that the interference would be more likely to be a problem if the facility was located at North Shore or Homestead than at Beautiful Savior. On June 18, 2001, he testified to the same effect, stating that interference problems would be expected at the North Shore and Homestead sites.

In a July 25, 2001 letter, Amstadt further outlined the problems with the North Shore and Homestead sites. He stated that when sites were too close to one another, the system was degraded resulting in increased interference, poor voice quality, reduced system capacity and dropped calls. He further stated that these effects would occur not only in the immediate area of the sites but in other areas of the network.

In his August 3, 2001 report, Evans quantified the coverage problems at the North Shore and Homestead sites, stating that while the Beautiful Savior site would achieve 94.8 percent coverage of the targeted area, the Homestead site would produce only 71.5 percent and the North Shore site 72.1 percent. At the hearing on August 6, 2001, he declined to endorse Commissioner Ridley's suggestion that 71 percent or 75 percent coverage was acceptable. Rather, Evans testified that locating the facility at either of the alternative sites would not be "good engineering." (Schill Decl. Ex. B at 34.)

Also at the August 6 hearing, Amstadt advised the Commission that Verizon would not use the North Shore or Homestead sites because they would have a negative effect on service in areas outside the targeted area. He stated that the effect of using those sites would be to create sites too close to one another and to generate interference in other areas. "We compromise other areas of the network by having these sites too close to one another." (Schill Decl. Ex. B at 31.)

Thus, there is *no* evidence in the record, much less substantial evidence, that either the North Shore or Homestead site constituted a technologically feasible alternative to the Beautiful Savior site. The uncontradicted evidence was that neither site would achieve adequate coverage, and that both would be too close to other sites in the network and that such proximity would result in interference with service both in the area targeted for coverage and in other parts of the network.

The City argues that there was substantial evidence that the alternative sites would provide 71 or 72 percent coverage and that, as a governmental entity, it was free to make a policy decision that sites providing such coverage were adequate. However, the City's argument fails for several reasons.

First, the evidence indicated that the question of whether a site was adequate was a technical one that could not be determined by laypersons. Evans stated that the decision as to the technological feasibility of a site could not be made by "persons who are not trained in the technology." (Schill Decl. Ex. C at 1.) He further stated that it was "not possible" to make a site analysis solely on the basis of a propagation map showing how much coverage a particular site would be likely to achieve. (*Id.*)

■ A decision that is based on the resolution of technical issues cannot be sustained under the substantial evidence standard where the determination was made based not on testimony and evidence in the record but rather on the adjudicator's own independent findings on the technical issues. *Cf. Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996) (stating that ALJs may not "play doctor" and make their own independent medical findings in social security cases, which employ a "substantial evidence" standard of review); *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir.1992) (quoting *Rousey v. Heckler*, 771 F.2d 1065, 1069 (7th Cir.1985)) ("The Secretary's decision must be based on testimony and medical evidence in the record, and the Secretary 'cannot make his own independent medical determination about the claimant.' "). The adjudicator's unsubstantiated belief is insufficient under this standard. *See McCarthy v. Apfel*, 221 F.3d 1119, 1126 (9th Cir.2000). In the present case, the City's determination was flawed because it was not based on competent evidence in the record.

Second, the City's argument that, notwithstanding the evidence, it was free to determine that the North Shore and Homestead sites were technologically feasible because they could achieve 71 or 72 percent coverage ignores the evidence indicating that technological feasibility depends on factors other than coverage. Evans testified that the feasibility of a site depended on such other factors as (1) "talk-in," the ability of a portable phone inside a car to contact the cell site; (2) "shadowing," the effect of geography, trees and structures; and (3) "interference," whereby one site on the network interferes with another one even though the propagation map shows there is coverage. (Schill Decl. Ex. C at 1.) The uncontradicted evidence was that the North Shore and Homestead sites were too close to other facilities in the network and that the result would be unwanted interference.

The City discounts this evidence, arguing that interference was merely a subcategory of coverage. However, the City's argument is not supported by the record. In his June 5, 2001 submission, Evans made clear that coverage and interference were separate problems. He stated that coverage was depicted on the propagation maps and referred to the "level of signal received by the wireless phone from the cell site," whereas interference occurred when "one site on the network interferes with another one, even though the propagation map shows that there is coverage." (Schill Decl. Ex. C at 1.) Further, the evidence demonstrated that the interference problem that would result from siting the facility at North Shore or Homestead would occur not only in the area targeted for coverage but in other parts of the network. Amstadt testified that siting the facility at North Shore or Homestead, where no facility was needed, would "generate interference in other areas." (Schill Decl. Ex. A at 32–33.) He made the same point in his July 25, 2001 letter when he said that locating at North Shore or Homestead would cause the system to be degraded.

Thus, the Commission's finding that the North Shore and Homestead sites consti-

tuted technologically feasible alternatives to the Beautiful Savior site and were, therefore, "available" to Verizon was not supported by substantial evidence. The evidence that these sites were not technologically feasible was uncontradicted, and in the absence of evidence supporting a contrary conclusion, the Commission was not free to find otherwise. Further, aside from the adequacy of the coverage that could be achieved at the North Shore and Homestead sites, the uncontradicted evidence was that both sites were infeasible because of the interference that would be generated. Finally, the evidence showed that coverage and interference were separate problems.

### B. Were Requirements for Denying Conditional Use Permit Satisfied?

▮ As previously discussed, under the wireless facility amendment to the zoning ordinance, Verizon's application was also subject to the general conditional use requirements of the City's zoning ordinance. Under the conditional use ordinance, the City could not deny Verizon's application unless it concluded that the proposed use:

would likely: Materially endanger the public health, general welfare, and safety, or substantially injure the value of adjoining or abutting property, or be inharmonious with the area in which it is to be located, or will not be in general conformity with the Land Use Plan, Transportation Plan, Environmental Plan, Park and Recreational Plan, or other officially adopted plan.

(Schill Decl. Ex. G at 26.)

The Commission did not find that any of the above factors existed. Further, the evidence would not have supported such a finding. No witness testified that the proposed facility would endanger the welfare or safety of the community. One witness, Mark Koerner, said that he thought that the facility might involve health risks but gave no reason for this opinion and, in any case, under the TCA, the possibility of such risks cannot be a basis for denying a permit. No witnesses testified that the facility would adversely impact the value of adjoining or abutting property. Koerner was the only witness who arguably testified that the facility would be inharmonious with the neighborhood. He stated that the facility would be unattractive but, again, he gave no reason for his opinion.

There was considerable testimony that the flagpole would be harmonious with its surroundings. Evans testified that the facility would not be visually intrusive because it would not be as high as most wireless facilities, would be screened from view by trees, and would be located at the rear of the church property. Gerry Nagel testified to the same effect, and Reverend Hildebrandt testified that he had viewed a similar flagpole in Waukesha County and found it aesthetically pleasing. Further, Klingman testified that Verizon had agreed to rebuild a garage on the church grounds and add a lannon stone exterior so that it would blend in with the church.

▮ The other opposing witnesses said nothing at all about the Beautiful Savior site. Clifford Pukaite opposed siting any wireless facility in any residential areas or on tax-free property. Alderman Reinemann's concerns were also general in nature, and Darrell Laux said only that he opposed the project. Generalized statements of concern about siting facilities in residential areas are of no evidentiary value in determining whether a decision to reject a specific site was based on substantial evidence. The question of whether there is substantial evidence is a fact-based inquiry and, to be of value, evidence must relate to the specific site being considered. See *Voicestream Minneapolis, Inc. v. St. Croix County,* 212 F.Supp.2d 914, 934 (W.D.Wis.2002).

Thus, the record does not contain substantial evidence that under the City's standards for evaluating an application for a conditional use the Beautiful Savior site was problematic in any way. The record contains no evidence, much less substantial evidence, that the proposed facility would endanger public health, welfare or safety, injure the value of adjoining or abutting property, be inharmonious with the area in which it was to be located, or not be in conformity with an officially adopted plan.

## C. Conclusion

For the reasons stated, the City's denial of Verizon's application for a conditional use permit was not based on substantial evidence. The record does not contain substantial evidence either that a technologically feasible alternative site was available or that the proposed use would adversely affect the community's health, safety or welfare, lower the value of neighboring property, be inharmonious with the neighborhood or not conform to an official plan.

## IV. CONSTITUTIONALITY OF ORDINANCE

Verizon challenges the constitutionality of the wireless facility amendment to the City's zoning ordinance, arguing that the provision requiring that a proposed location be "necessary to comply with the 1996 Telecommunications Act and subsequent case law interpreting that act," Mequon, Wis., Ordinances § 3.166(6)(b) (found at Schill Decl. Ex. G. at 147), is "illegally vague and irrational." (Pl.'s Br. at 15.) Similar language also appears in the section of the ordinance providing "installation criteria." § 3.166(6)(a)a & b (found at Schill Decl. Ex. G at 147).

The "necessary to comply with" language appears to be an attempt to transform the TCA's limitation on a municipality's authority to prohibit service into a substantive standard for judging applica-

tions to site wireless facilities. Under the limited scope of judicial review provided by the TCA, however, it is unclear to me whether I am authorized to address the issue of the ordinance's legality. In any case, because the City's decision was not based on substantial evidence, it is unnecessary for me to do so. *See Chowdhury v. Ashcroft*, 241 F.3d 848, 853 (7th Cir.2001) (stating that courts should construe statutes and apply administrative procedures in a way that avoids constitutional problems if possible).

## V. SECTION 1983 CLAIM

I now turn to the question of whether a TCA claim gives rise to an action under § 1983. Section 1983 provides a federal cause of action for violations of federal rights. *See Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). However, a violation of federal rights does not occur automatically whenever a municipality violates a federal statute. Rather, three factors must be present. First, the federal statute at issue must have been intended by Congress to benefit the plaintiff; second, the right created must not be so amorphous that its enforcement would "strain judicial competence"; and third, the obligation must be imposed in a binding and unambiguous manner so that compliance is mandatory. *See Blessing v. Freestone*, 520 U.S. 329, 340–41, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997); *see also* Robert Heverly, *Siting Wireless Facilities Under Telecommunications Act § 704, Circuits Split on Substantial Evidence*, 25 Zoning and Planning L. Rep. 4 (Jan 2002).

However, even if a plaintiff demonstrates that a federal statute creates an individual right, there is only a rebuttable presumption that the right is enforceable under § 1983. The presumption may be rebutted by a showing that Congress

"foreclosed a remedy under § 1983." *Blessing,* 520 U.S. at 341, 117 S.Ct. 1353 (citations omitted). Congress may do so expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983. *See Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Ass'n,* 453 U.S. 1, 20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).

Thus, the questions presented are whether § 332(c)(7)(B)(v) creates a federal right to providers of wireless service and, if so, whether Congress has precluded the use of § 1983 remedies. With respect to the first question, the only direct beneficiary of the language in the TCA relating to the siting of wireless facilities are wireless service providers; thus, it is clear that Congress intended to protect them. Secondly, it would clearly not strain judicial competence to enforce the statute under § 1983 because courts must already enforce the statute. Finally, § 332(c)(7)(B)(v) includes only mandatory language, thus, it would appear that where any of the TCA's provisions, whether substantive or procedural, are violated, the final prong of the "federal rights" analysis is met. Heverly, *supra,* at 5; *but see Vertical Broad., Inc. v. Town of Southampton,* 84 F.Supp.2d 379, 391–94 (E.D.N.Y.2000) (finding that Congress's preservation of some authority in local governments to control zoning of wireless facilities precludes a finding that a federal right was created).

Thus, the question becomes whether Congress foreclosed the use of § 1983 remedies. It did not do so explicitly; but whether it did so implicitly through the implementation of a sufficiently comprehensive remedial scheme is a more difficult issue. The Seventh Circuit has not yet addressed the question. However, the Third Circuit recently held that the TCA did, in fact, implicitly preclude § 1983 remedies. *Nextel Partners, Inc. v. Kingston Township,* 286 F.3d 687, 694–95 (3d Cir. 2002). The court reasoned that the key distinction between schemes that are sufficiently comprehensive to preclude a § 1983 claim and those that are not is the availability of private judicial remedies under the statute giving rise to the claim, and that because the TCA created such remedies it intended to preclude relief under § 1983. *Id.*

The court further found that to permit plaintiffs to assert TCA claims under § 1983 would upset the balance of interests incorporated in the statute, particularly if TCA plaintiffs were able to recover attorneys fees. *Id.* at 695. The court found that Congress could not have intended this result because TCA plaintiffs were often large corporations, whereas TCA defendants were typically municipalities, often small ones. *Id.* The court further stated that to allow TCA plaintiffs to recover attorneys fees might well unnecessarily increase the federal burden on local land-use regulation beyond that intended by Congress. *Id.*

▮ I find the reasoning of the *Nextel* court to be persuasive. Thus, I also conclude that the TCA contains a remedial scheme that is sufficiently comprehensive to indicate that Congress impliedly foreclosed resort to § 1983. I am aware that district courts are divided on this issue and that a panel of the Eleventh Circuit, in a decision that was later vacated, reached a contrary conclusion. *See AT&T Wireless PCS, Inc. v. City of Atlanta,* 210 F.3d 1322 (11th Cir.2000), vacated, 220 F.3d 594 (11th Cir.2000).

## VI. REMEDY

▮ The TCA does not specify a remedy for violations of the subsection relating to the siting of wireless facilities. It does,

however, direct courts to decide cases arising under this subsection "on an expedited basis." § 332(c)(7)(B)(v). Most courts have held that the appropriate remedy is an order to issue the relevant permit. *Cellular Tel. Co.*, 166 F.3d at 497; *see also Nextel Partners, Inc.*, 286 F.3d at 695 n. 6 (noting that the typical relief is injunctive). In the present case, no useful purpose would be served by remanding for further proceedings. Such an order would simply further delay resolution of the issue.

Therefore, for the reasons stated,

**IT IS ORDERED** that the City issue to plaintiff a conditional use permit to construct the stealth facility at Beautiful Savior Lutheran Church.

**IT IS ALSO ORDERED** that plaintiff's § 1983 claim is **DISMISSED.**