CALIFORNIA RSA NO. 4 d/b/a Verizon Wireless by and through Its General Partner Pinnacles Cellular Inc., Plaintiff,

v.

MADERA COUNTY and the Board of Supervisors of Madera County, Defendants.

No. CV F 02–6605 SMS.

United States District Court, E.D. California.

Oct. 10, 2003.

Ronald Edward Van Buskirk, Pillsbury Winthrop LLP, San Francisco, CA, for plaintiff.

Douglas W. Nelson, Madera County Counsel, Madera, CA, for defendants.

ORDER GRANTING PLAINTIFF'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (DOC. 12)

ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY ADJUDICATION (DOC. 11)

ORDER SETTING INFORMAL TELE-

PHONIC STATUS CONFERENCE for OCTOBER 31, 2003, at 11:00 A.M.

SNYDER, United States Magistrate Judge.

The motion of Plaintiff for summary judgment and summary adjudication came on regularly for hearing on Thursday, September 25, 2003, at 9:30 a.m. in Courtroom 4 before the Honorable Sandra M. Snyder, United States Magistrate Judge. Ronald E. Van Buskirk and Diana Graves of Pillsbury Winthrop appeared on behalf of Plaintiff, and Douglas W. Nelson of the Madera County Counsel's Office appeared on behalf of Defendants. The Court had reviewed all the papers submitted in support of and in opposition to the motion. After argument, the matter was submitted to the Court.

## INTRODUCTION [1]

Plaintiffs are proceeding with an action asserting a violation of 47 U.S.C. § 332(c)(7)(B). The matter has been referred to the Magistrate Judge for all proceedings, including the entry of final judgment, pursuant to 28 U.S.C. § 636(c), Fed. R.Civ.P. 73(b), and Local Rule 73–301.

Plaintiff, Verizon Wireless ("VZW"), has filed a motion for summary judgment on its claims under Section 704 of the Telecommunications Act of 1996 (47 U.S.C. § 332(c)(7)(B)), challenging the denial by the County of Madera ("County") of VZW's application for a conditional use permit for a wireless facility in the Yosemite Lakes Park ("YLP") subdivision in Coarsegold, California. The parties have completed briefing on the summary judgment motion and submitted the administrative record of the County's action to the Court.[2] Plaintiff's request that the Court

1. The introduction is derived from the parties' joint summary of facts.

2. See Record of Proceedings, Vol. 1 of 1, pages 0001–0475.

take judicial notice of various documents concerning legislative history and portions of a zoning ordinance will be granted.

Pursuant to the parties' consent and the June 18, 2003 status conference order,[3] the County has filed its Amended Answer dated June 20, 2003. The parties also complied with the direction to "jointly file a summary of all facts in the record material to the motion for summary judgment, which shall be accompanied by a collection of excerpted portions of the record reflecting the facts material to a review of the substantiality of the evidence or to any other issue in dispute."

VZW has asserted three claims under Section 704:(1) that the County failed to issue a written decision as required by the statute; (2) that the County lacked substantial evidence to deny the use permit in the circumstances; and (3) that the County's action amounts to a prohibition of wireless service in violation of Section 704. Under the Amended Answer, the County does not dispute the first claim. The County does dispute claims 2 and 3.

The parties submitted a joint summary of facts bearing upon the Section 704 claims asserted by VZW and an appendix of documents and transcript excerpts from the administrative record upon which each side relies to support its position on the disputed claims. The excerpts have been highlighted to show the precise evidence relied on by each side.[4]

## FACTS

The facts are taken from the parties' joint summary of facts as augmented by the Court's review of the record.

---

3. Order Following Summary Judgment Status Conference, dated June 18, 2003.

4. VZW has highlighted pertinent facts in support of its claims in yellow. The Court has

## I. Description of the Facility

In December, 2000, California RSA No. 4, doing business as Verizon Wireless ("VZW"), filed a site approval application (Application No.2000–36) with the Madera County Planning Department for a use permit to install a telecommunications facility approximately 1,500 feet southwest of the intersection of Blue Heron Way and North Dome Drive (otherwise named "Outlot D") in the YLP subdivision in Coarsegold, California. *Administrative Record ("AR") 0034.*

The VZW application proposed a wireless communications facility consisting of four six (6)-inch diameter poles, 25 feet in height, with attached whip antennas, with a combined height of approximately 30 feet. The poles would be located approximately four feet from an existing 50,000 gallon water tank 25 feet in height. The water tower is an existing for-profit commercial use on Outlot D and is served by an existing road and public utilities; Outlot D is subject to an easement from the Yosemite Lakes Owners' Association, granted in 1976, for construction and operation of public utility facilities including telephone lines and necessary appurtenant facilities. *AR 0001, 0471.23–0471.27; AR 0096–97 (May 7, 2002 Planning Commission Staff Report); AR 0179–0185 (August 20, 2002 Memo from Appellant to Board of Supervisors).*

Three refrigerator-sized cabinets to house telecommunications equipment would be placed approximately 45 feet from the base of the water tank on a 15 by 15 foot concrete pad. The equipment cabinets would be located within an existing fenced area around the tank and would not

---

reviewed the entire record submitted by the parties on April 28, 2003, as well as the excerpts and the matters of which the Court has taken judicial notice.

be visible from the adjacent housing community. The closest residence is more than 250 feet from the equipment cabinets. *AR 0107, 0187, 0192, 0471.11.*

## II. *Zoning and General Plan Designations*

The proposed site for the facility is located in a OS/MHA (Open Space/Manufactured Housing Architectural Review Overlay) zoning district which allows telecommunications facilities with approval of a conditional use permit. *AR 0054, 0096 –97.*

The proposed facility is lower than the 35 foot maximum allowable height for structures in the open space zone. *AR 0096—97.*

Madera County General Plan Policy 3.J.1 states that the County shall "facilitate the provision of adequate gas and electric, communications and telecommunications services and facilities to serve existing and future needs while minimizing noise, electromagnetic and visual impacts on existing and future residents." *AR 0208.*

## III. *Description of the County's Actions*

The Planning Department prepared and submitted to the County Planning Commission a Staff Report recommending approval of the project. *AR 0052–0058.* The Staff Report included attachments of supporting documents from VZW; four letters opposing the project; recommendations in favor of the project from the County Engineer, County Road Department, and Count Fire Department; and a proposed Mitigated Negative Declaration. *AR 0059–0085.* Both the Staff Report and the Mitigated Negative Declaration stated that the project would have no significant environmental impacts, no significant community impacts, and would not violate the spirit or intent of the zoning ordinance. *AR 0052, 0079–81, 0094, 0127–0129.*

On February 6, 2001, the Planning Commission held a public hearing to consider VZW's application.[5] VZW presented testimony in support of the project. Ten persons spoke in opposition to the project, and a petition with 251 signatures was submitted opposing the project. The Commission was advised that the YLP Homeowners Association owned Outlot D and that the Association Board of Directors had given VZW permission to apply for the use permit, although the Board and VZW were still negotiating a lease. *AR 0088–89, 0095.* The Planning Commission stated that "the proposed towers were the least intrusive of any tower they have approved", but denied the application without prejudice because VZW was still negotiating lease terms with the YLP Homeowners Association as the site owner. *AR 0089.*

Following finalization of the lease agreement with the Homeowners Association, VZW requested that the Planning Commission reconsider the use permit. *AR 0092.*

The Planning Department submitted a second Staff Report to the Planning Commission recommending approval of the project. *AR 0094–0100.* The Staff Report concluded the project would have no significant impacts and recommend adoption of the Mitigated Negative Declaration. *AR 0098.* The Staff Report noted that one additional letter in opposition had been submitted; attached the four opposition letters to the report; and noted that a survey of YLP Homeowners Association members indicated 71% of those responding were in favor of the project. *AR 047.14.*

---

**5.** The transcript of the hearing is not available. (A.R. at 86.)

The Planning Commission held a public hearing on reconsideration of the permit on May 7, 2002.[6] VZW presented its application to the Planning Commission and testified that VZW required the proposed facility to fill a "dead area" along Highway 41 and that this site provided the best coverage to the area while providing access to the infrastructure required to build and maintain the facility. *AR 0154.* The Planning Commission received testimony from seven local residents stating concerns that the installation of the facility would violate the CC & R's of the Homeowner's Association, encourage further development in the area, decrease property values due to perceived health risks, present actual health risks from Radio Frequency ("RF") radiation, and generate noise. *AR 0154–0155.*

Following the public hearing, the Planning Commission voted to deny the permit, finding that the facility: (1) "will not violate the spirit or intent" of the zoning ordinance; (2) "the use of open space for a cell tower was contradictory to the General Plan" and "the granting of this Conditional use permit will not be consistent with the 1995 General Plan because it is not compatible with the objectives, policies, general land uses, and programs specified in the General Plan and will inhibit or obstruct the attainment of those articulated policies"; (3) the proposed use will be contrary to the public health, safety, or general welfare of the citizens of Madera County"; (4) "the perceived health risk of the cell tower could affect the surrounding property owners"; (5) "the proposed use will be hazardous, harmful, noxious, offensive, or a nuisance by reason of noise, dust, smoke, odor, glare or other similar factors"; (6) "the possible noise generated by the fans in the equipment shed could be too loud for the surrounding property owners;" (7) the "proposed use

will cause a substantial effect upon the property values and general desirability of the neighborhood or of the County"; (8) "past studies have been done on perceived health risks lowering the property values in some areas." *AR 0156–0157.*

On May 14, 2002, pursuant to County ordinances, VZW appealed the Planning Commission's denial to the Board of Supervisors. *AR 0158.*

On August 20 and 23, 2002, VZW submitted photo-simulations, scientific reports on noise and RF radiation, emergency services support letters, access road improvement descriptions, petitions in support of the facility, evidence of lease and other entitlement approvals granted by the YLP Homeowners Association for the site on Outlot D, and other project information to the Board of Supervisors. (A.R. at 179–210.)

On August 27, 2002, the Board of Supervisors held a public hearing to consider VZW's appeal. *AR 0170.* At the hearing, members of the public presented letters, petitions and testimony in favor of and opposed to the facility. Eight community members testified in support of the facility. *AR 0471.57–047167.* Six community members testified against the facility, raising concerns over use of a recreational/greenbelt area, alternative sites, equipment noise, health effects of RF radiation, public perception of decreased property values, and the Homeowner Association entitlement issues. *AR 0471.67–0471.88.* VZW presented exhibits and expert testimony addressing the lack of any visual impacts, the YLP Homeowners Association entitlements to the site, planning and zoning compatibility, RF radiation safety, the basis for their belief of the lack of alternative sites, the lack of any noise impact, and project support from emergency service

---

**6.** The transcript of this hearing is not available.

agencies. *AR 0471.6–0471.60.* VZW's evidence included exhibits with drive test results and signal coverage maps with and without the proposed site, as showing the need for the facility. *AR 0219–0222.*

Following the hearing, the Board voted 3–1 to deny the permit. The Board did not issue any findings or written decision. *AR 0416, 0472.1.*

IV. *Summary of Facts relating to the Substantial Evidence Claim*

A. *Staff Reports*

The Mitigated Negative Declaration prepared by the Madera County Environmental Committee finds, "No adverse environmental impact is anticipated from this project... no significant amounts of traffic, noise, dust, light, or glare will result from this development, [and] that no biological or cultural resources will be degraded ...." *AR 0127–0129.*

The Planning Department Staff analysis of the proposed facility states:

(a) the maximum allowable height in the OS (Open Space) zoning district is 35 feet and the current proposal will not exceed this requirement (*AR 0097* );

(b) the existing 50,000 gallon water tank located on the project site has a height of 25 feet, the proposed telecommunications poles will be placed within four feet of this tank and the whip antennas proposed for the tops of the poles will bring the maximum height of the poles to 30 feet, which is five feet in excess of the existing tank (*AR 0097* );

(c) the applicant has expressed a willingness to paint or treat the poles and accessory equipment to match the color of the existing water tank and this measure will minimize the visibility of the facility (*AR 0097* ); and

(d) conditions will be placed upon the project requiring removal of the facility should it become inoperative in the future (*AR 0097* ).

The Planning Department Staff recommended that the use permit be granted with the following findings:

(a) *The proposed project does not violate the spirit or intent of the Zoning Ordinance because* the proposal meets the intent of the zoning ordinance which encourages location criteria which minimizes the visibility of communications facilities. This project would utilize a low elevation of thirty feet and the proximity to an existing structure to minimize its visibility from surrounding properties. *AR 0098.*

(b) *The proposed project is not contrary to the public health, safety or general welfare in that* the proposal, in accordance with findings made by the FCC (Federal Communications Commission), will not pose a threat to public health or safety. Construction and operation of the facility must meet FCC standards for radio frequency operations. *AR 0098.*

(c) *The proposed project is not hazardous, noxious, offensive or a nuisance because of noise, dust, smoke, odor, glare, or similar factors in that* the proposal, an unmanned telecommunications facility, will not generate any of the above concerns. The facility will be unmanned and will generate only a minimal amount of noise from on-site electrical equipment. Parking and circulation areas within the project lease area must be maintained with gravel or another form of surfacing to reduce dust. The facility will not generate smoke or odors. The communication antennas will be painted in such a manner as to reduce glare and blend in with the existing water tank. *AR 0098.*

(d) *The proposed project will not for any reason cause a substantial, adverse effect upon the property value and general desirability of the neighborhood or*

*of the County in that* the placement of the antennas as proposed will have limited visibility from surrounding developed property. The visual impacts of the proposed facility will be significantly less than those which could occur from a full-scale freestanding communications tower. The proposal will utilize the existing water tank to help reduce the visual impact of the proposal. *AR 0098.*

### B. *Public Testimony*

The YLP Homeowners Association conducted a survey which indicated 71% of respondents supported the facility (71% of 490 responding out of a total of 2,050 owners). *AR 0210.*

The record contains numerous community petitions (approximately 550 signatures) and 53 individual letters and public comments in support of the facility. *AR 0202, 0203 (letters from County Fire Department and Sierra Ambulance Service), 0319–0415 471.62–471.76.* The record contains numerous community petitions (approximately 55 signatures) and about twenty letters and public comments in opposition to the facility. *AR 0124–126, 0223–0318, 471.67–471.88.* Further, sixty-one form letters were submitted objecting to the "towers" on various grounds. *AR 0250–0311.* Fewer than 40 of the form letters listed specific concerns, such as the "concern over health risks", the "perception of potential danger from electromagnetic fields" and that "noise levels may be an excessive nuisance." *AR 0250–0311.*

### C. *Expert Testimony*

During the Board hearing, VZW provided expert testimony in response to all expressed community concerns regarding suitability of the parcel, zoning compatibility, visibility and visual impacts of the facility, RF safety, need for the site to obtain signal coverage, and noise:

(a) "Outlot D is essentially unregulated because it has a water tower, has been used for for-profit public utility purposes.... The easement that was granted [for the water tower] refers not only to the water facilities, but any public utility facilities, including electric power cables, telephone line, liquid waste disposal. So this is a use that is compatible with the historic use of the site and consistent with the terms and conditions of the Declaration of Restrictions."

*Comments of Robert Rosatti, attorney for YLP Homeowners Association regarding authority of YLP Homeowners Association to enter into lease with VZW. AR 0471.21–0471.25.*

(b) The proposed project is compatible with the General Plan, zoning and county policy related to telecommunications facilities. *Comments of Arlan Nickel, Planning Representative for Verizon Wireless, AR 0208, 0471.28–0471.31.*

(c) The County has a telecommunications policy that favors siting facilities either (1) in agricultural areas; (2) on existing structures, such as barn silos, water or PG & E towers; and (3) adjacent to existing structures. *AR 0471.30.*

(d) "The project design is four very simple steel poles which are located next to an existing very large 500,000 gallon water tank .... [T]his is not a pristine and open-space area. This is a utility easement that is used for utility purposes here... when you hear testimony—in fact, we've heard several times already that this is pristine open—[ ] this is not it. This is the utility easement."

*Comments and visual presentation of Arlan Nickel, Planning Representative for Verizon Wireless, AR 0183–0185, 0471.8–0471.12.*

(e) VZW presented approximately five photo-simulations during the Board hearing from various angles to demonstrate that "the water tank cannot be viewed from most of the areas around the Yosemite Lakes Park area. What we did is we drove around the various streets and roads in the community and looked at the various vantage points where we could look back from various intersections to the water tank." *Comments and visual presentation of Arlan Nickel, Planning Representative for Verizon Wireless, AR 0183–0185, 0471.8–0471.12.*

(f) "This site will comply with the prevailing [electromagnetic safety] standards, not only in the [ ], but in fact all of the standards world wide that I am familiar with easily and by a significant margin." *Comments and report of Robert D. Webber, Consulting Electrical Engineer with Hammet & Edison, Inc. AR 0194–200, 0471.31–0471.32.*

(g) "When we proposed this location here [Mt. Revis], and I requested radio tests, I actually looked at going higher which would have meant a tower. And the difference in the coverage... was not significant enough. And that's because of the terrain. It's a challenge with the terrain here to place one site to cover all of [Highway] 41." *Comments and coverage test results presented by Linda Mendiola, Radio Engineer for Verizon. AR 0219–222, 0471.37–0471.44.*

(h) There are "certain standards that the county imposes on what is a permissible noise level... the noise from these cabinets are going to be well below the counties compatibility standards and in a range where most people would say... inside a common residence [the noise will be] barely audible if indeed audible at all." *Comments and noise analysis presented*

*by Bill C. Thiessen, Senior Noise Consultant with Brown Buntin Associates. AR 0187–0192, 0471.46–0471.48.* The noise analysis demonstrates that the noise levels created by the facility will be approximately 23dBA, which is analogous to the volume of a whisper from four to six feet away. *AR 0188–189.* This noise level falls well below the Madera County night-time noise level allowance of 45dBA. *AR 0471.47.*

No expert testimony was presented in opposition to the project.

IV. *Summary of Facts relating to the Prohibition of Services Claim* [7]

Members of the Board supported the improvement of VZW's coverage along Highway 41. *AR 0471.88–0471.89.*

VZW needs this site to remedy a lack of universal signal coverage in the area and provide consistent service along Highway 41 and other roads in Madera County. *AR 0073, 0116, 0180. 0471.37.*

The transcript reflects discussion between VZW and the Board regarding alternative locations which could provide adequate wireless coverage. *AR 0471.37–0471.44*

VZW testified at the Board hearing that this site is necessary to provide wireless services to this section of Yosemite Lakes Park and Highway 41. *AR 0179–0181, 0471.37–0471.44.*

VZW submitted Drive Test maps and Projected Coverage Area maps that demonstrated that the facility is essential to provide access to wireless service on Highway 41. *AR 0219–0221, 0471.41–0471.44.*

VZW submitted a memorandum to the Board which states:

---

**7.** Although the Court does not reach this issue, the facts are set forth to provide context for the Defendants' actions.

"The land parcel where the water tank is located is extremely well suited for a communications facility. This location has electrical power and telephone utilities close by, as well as an existing access road. Virtually no other hilltop locations in the surrounding area have these qualities (utilities and a road in existence) and which also provide the strategic coverage of Hwy. 41 and the YLP area."

*AR 0180.* VZW's Radio Engineer explained the technical aspects of siting a telecommunications facility. AR 0471.37–0471.44. She showed the County diagrams and maps illustrating the signal strength of VZW's network with and without the proposed facility. *AR 0219–0222, 0471.40.*

The Board of Supervisors had no information or testimony before it to contradict the Radio Engineer's testimony that this particular site was the only feasible location to serve this section of Highway 41 and Yosemite Lakes Park.

In response to the County's questions and suggestions regarding potential alternative locations, VZW's radio engineer testified that the suggested options were not feasible or could not provide the necessary service. *AR 0471.40–0471.44.*

Supervisor Silva and Supervisor Dominici expressed disbelief that VZW could not locate another site along Highway 41 which would provide the same coverage as the Mt. Revis proposal. *AR 0471.41–0471.43, 0471.90.*

There was no scientific information presented to the Board of Supervisors to show any alternative site was feasible to provide the needed coverage along Highway 41 and in the Yosemite Lakes Park area.

## ANALYSIS

I. *Subject Matter Jurisdiction*

Title 47 U.S.C. § 332(c)(7)(b)(v) provides:

Any person adversely affected by any final action or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis. Any person adversely affected by an act or failure to act by a State or local government or any instrumentality thereof that is inconsistent with clause (iv) may petition the Commissioner for relief.

The section contains language customarily used in statutes of limitations, and it has been so interpreted. *Airtouch Cellular v. City of El Cajon,* 83 F.Supp.2d 1158, 1162 (S.D.Cal.2000) (recognizing the effectiveness of a tolling agreement to extend time to file an action in federal court). There is no dispute that there has been final action in this case within the meaning of the statute. Thus, the Court has subject matter jurisdiction pursuant to § 332 and 28 U.S.C. § 1331 (civil actions arising under the laws of the United States).

II. *Summary Judgment Standards*

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). Under usual summary judgment practice, the moving party

[A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). It is the moving party's burden to establish that there exists no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *British Airways Board v. Boeing Co.*, 585 F.2d 946, 951 (9th Cir.1978).

However, in an action such as this in which the Plaintiff challenges the final decision of an administrative agency, the Court does not utilize the standard analysis for determining whether a genuine issue of material fact exists. In *Occidental Engineering Co. v. INS*, 753 F.2d 766, 769–70 (9th Cir.1985), Occidental challenged the denial by the Immigration and Naturalization Service (INS) of the employer's petition to reclassify one of its employees. In the appeal of the district court's grant of the motion for summary judgment, the Ninth Circuit stated:

> Occidental contests the district court's grant of summary judgment on the grounds that there exist disputed issues of material fact. But there are no disputed facts that the district court must resolve. That court is not required to resolve any facts in a review of an administrative proceeding. Certainly, there may be issues of fact before the administrative agency. However, the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did. De novo factfinding by the district court is allowed only in limited circumstances that have not arisen in the present case. See, e.g., *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 415, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); *Proietti v. Levi*, 530 F.2d 836, 838 (9th Cir.1976); *Dredge Corporation v. Penny*, 338 F.2d 456, 462 (9th Cir.1964). The appellant confuses the use of summary judgment in an original district court proceeding with

the use of summary judgment where, as here, the district court is reviewing a decision of an administrative agency which is itself the finder of fact. In the former case, summary judgment is appropriate only when the court finds there are no factual issues requiring resolution by trial. In the latter case, summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did.

It thus must be determined whether or not where is substantial evidence in the record to support Defendants' findings.

### III. *Substantial Evidence*

RSA asserts that Defendants' decision to deny the CUP is not supported by substantial evidence.

Title 47 U.S.C. § 332(c)(7)(B)(iii) provides:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

In enacting this statute, it was the intent of Congress to apply "the traditional standard used for judicial review of agency actions." H.R.Rep. No. 104–458 at 208, reprinted in 1996 U.S.C.C.A.N. 10. Substantial evidence is more than a scintilla and less than a preponderance, and it consists of such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; to determine the substantiality of evidence, a court will view the record in its entirety and take account of evidence unfavorable to the agency's decision. *American Textile Mfr. Inst., Inc. v. Donovan*, 452 U.S. 490, 523, 101 S.Ct. 2478, 69 L.Ed.2d 185 (1981); *Omnipoint Corp. v. Zoning Hearing Bd.*, 181

F.3d 403, 408 (3d Cir.1999); *Aegerter v. City of Delafield,* 174 F.3d 886, 888–89 (7th Cir.1999); *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 493–94 (2d Cir.1999); *MetroPCS, Inc. v. City and County of San Francisco,* 259 F.Supp.2d 1004, 1010 (N.D.Cal.2003); *Airtouch Cellular v. City of El Cajon,* 83 F.Supp.2d 1158, 1164 (S.D.Cal.2000). Local and state zoning laws govern the weight to be given the evidence. *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 494 (2nd Cir.1999); *Omnipoint Communications Enterprises, L.P. v. Zoning Hearing Board of Easttown Township,* 248 F.3d 101, 106 (3d Cir.2001).

In performing this review, the Court is mindful that § 332(c)(7)(B)(iii) does not substitute the federal courts for local legislatures, which are still empowered to make decisions within the express limits of § 332. As the court stated in *Amherst, N.H. v. Omnipoint Communications,* 173 F.3d 9, 13 (1st Cir.1999):

> The statutory provision before us, 47 U.S.C. § 332(c)(7), is a deliberate compromise between two competing aims— to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers. [FN3]
>
> FN3. An initial House version of this provision required the formation of an FCC rulemaking committee charged with developing a uniform national policy for the deployment of wireless communication towers. The bill as it emerged from conference committee rejected such a blanket preemption of local land use authority, but retained specific limitations on local authority now reflected in the statute itself. See H.R. Conf. Rep. No. 104–458, at 207–09 (1996).

However, it is also established that in enacting the statute, Congress was concerned with the inconsistent and occasionally conflicting "patchwork of requirements" that could inhibit deployment of personal communications services, and it endeavored to expand wireless services and increase competition among providers by reducing the regulation and bureaucracy precluding steady and rapid expansion of service and protecting against decisions by local authorities that are irrational and without substance. *Southwestern Bell Mobile Systems, Inc. v. Todd,* 244 F.3d 51, 57 (1st Cir.2001) (quoting *Omnipoint Corp. v. Zoning Hearing Bd. of Pine Grove Township,* 181 F.3d 403, 407 (3d Cir.1999), quoting in turn from H.R. Rep. 104–204). Under the Act, local governments retain control over decisions regarding the placement, construction and modification of personal wireless service facilities (§ 332(c)(7)(A)) so long as they are 1) supported by substantial evidence (§ 332(c)(7)(B)(iii)); and 2) do not a) unreasonably discriminate among providers of functionally equivalent services (§ 332(c)(7)(B)(i)), b) prohibit or have the effect of prohibiting the provision of personal wireless services (*id.*), or c) are not based on the environmental effects of radio frequency emission to the extent that such facilities comply with the Federal Communications Commission's regulations concerning such emissions (§ 332(c)(7)(B)(iv)). *Southwestern Bell Mobile Systems, Inc. v. Todd,* 244 F.3d at 57–58.

 The reviewing court must take into account contradictory evidence in the record. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence. *Penobscot Air Servs., Ltd. v. Fed. Aviation Admin.,* 164 F.3d 713, 718 (1st Cir.1999) (citations omitted). However, this review, though highly deferential, "is not a rubber stamp." *Id.* at 718 n. 2. An agency, and by extension the

Board, "is not free to prescribe what inferences from the evidence it will accept and reject, but must draw all those inferences that the evidence fairly demands." *Id.* at 718 (quoting *Allentown Mack Sales & Serv., Inc. v. N.L.R.B.*, 522 U.S. 359, 378, 118 S.Ct. 818, 139 L.Ed.2d 797 (1998)). When the record "clearly precludes the . . . decision from being justified by a fair estimate of the worth of the testimony of witnesses or its informed judgment on matters within its special competence or both," that decision must be set aside. *Id.* (quoting *Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 490, 71 S.Ct. 456, 95 L.Ed. 456 (1951)).

There is a dispute as to which party bears the burden of proof with respect to substantial evidence. See *Cellular Telephone Co. v. Town of Oyster Bay*, 166 F.3d at 496–97 (finding it unnecessary to decide); *Airtouch Cellular*, 83 F.Supp.2d at 1164 (accepting the parties' stipulation that the city bear the burden of proof); *MetroPCS*, 259 F.Supp.2d at 1010. In the absence of Ninth Circuit authority, the Court accepts the concession of Plaintiff at hearing, which reflects the position of the Northern District of California in *MetroPCS* and of the First Circuit that the burden should be on the communications company because the decision, pursuant to Congress's intent, should be evaluated like any other administrative decision, and the standard should be deferential to the administrative agency, which in this case is the local board. *MetroPCS*, 259 F.Supp.2d at 1010 (citing *Second Generation Properties L.P. v. Town Pelham*, 313 F.3d 620, 627 (1st Cir.2002)).

Defendants argue that the basis of the County's decision was unclear and that thus the matter should be remanded. Title 47 U.S.C. § 332(c)(7)(B)(v) provides that when an action is brought by one adversely affected by final board action, the court shall hear and decide such action on an expedited basis. Here, the complete record of the proceedings is before the Court. Other than the making of formal or written findings, no other purpose for a remand has been suggested by Defendants. It does not appear that any evidence exists that has not already been presented to the County. Further, the issues have been fully briefed, and Defendants have made various arguments. At the hearing on this motion, Defendant's counsel asserted that the only issue before the County was aesthetics; however, in their papers, Defendants have asserted various reasons in support of the County's decision. In the amended answer, Defendants assert that the reasons for the denial were inconsistency with the general plan; the use would be contrary to the public health, safety or general welfare; the communications facility would cause a substantial impact on property values based on the perceived health risks; and it would be a nuisance because of noise. In their opposition to the motion for summary judgment, Defendants argue that the decision was supported by aesthetic considerations; effects on property values because of aesthetic impact; and Madera's policy, as reflected in the general plan, of preserving open space. They also assert that the record is devoid of evidence to support a conclusion that the Defendants' denial of the facility prohibits or has the substantial effect of prohibiting personal wireless services within the meaning of § 332(c)(7)(B)(ii).

In order to avoid further delay, the Court performs its statutory duty to review the record to determine if substantial evidence supports the County's decision.

A. *Inconsistency with the Policy to Preserve Open Space as Articulated in the General Plan*

■ A conditional use is a use of land or structures dependent upon exceptional cir-

cumstances allowed in any particular part of a zoned district by the granting of a permit. Madera County Zoning Ordinance, § 18.04.125. Uses permitted by the zoning ordinance, those specified in the zoning district regulations, and any other uses not specifically provided for may be approved by the zoning agency (here, the planning commission). § 18.92.010. A conditional use permit shall be granted only if it is found that the proposed use will not violate the spirit or intent of the zoning ordinance; will not be contrary to the public health, safety or general welfare; will not be hazardous, harmful, noxious, offensive or a nuisance by reason of noise, dust, smoke, odor, glare or other similar factors; and will not for any other reason cause a substantial adverse effect upon the property values and general desirability of the neighborhood or of the county. § 18.92.030. With respect to process, the planning commission hears appeals from the zoning administrator, and the board of supervisors hears appeals from the decisions of the planning commission. §§ 18.108.110–18.108.120.

State law provides that a zoning ordinance may provide for a zoning administrator (here, the planning director of the county pursuant to § 18.02.050 of the zoning ordinance) or a zoning agency (here the planning commission pursuant to § 18.02.060) to hear and decide applications for conditional uses, but no standards are set for the determination. Cal. Govt. Code. § 65901. In granting or denying a conditional use permit (CUP), the body acting performs an administrative or quasi-judicial act. *Goat Hill Tavern v. City of Costa Mesa,* 6 Cal.App.4th 1519, 1525, 8 Cal.Rptr.2d 385 (1992) (citing *Topanga Ass'n. for a Scenic Community v. County of Los Angeles,* 11 Cal.3d 506, 517, 113 Cal.Rptr. 836, 522 P.2d 12 (1974)).

Decisions on CUP's must be consistent with the general plan. *Neighborhood Ac-tion Group for the Fifth District v. County of Calaveras,* 156 Cal.App.3d 1176, 1187, 203 Cal.Rptr. 401 (1984); *Land Waste Management v. Contra Costa County Board of Supervisors,* 222 Cal.App.3d 950, 957–58, 271 Cal.Rptr. 909 (1990). In the context of analyzing the consistency of zoning ordinances with a general plan, an action, program, or project is consistent with the general plan if, considering all its aspects, it will further the objectives and policies of the general plan and not obstruct their attainment. *Corona–Norco Unified School Dist.,* 17 Cal.App.4th 985, 994, 21 Cal.Rptr.2d 803 (1993) (relying on General Plan Guidelines, p. 212, Governor's Office of Planning and Research, 1990); *Families Unafraid to Uphold Rural El Dorado County v. El Dorado County Bd. of Supervisors,* 62 Cal.App.4th 1332, 1336, 74 Cal.Rptr.2d 1 (1998).

In the present case, outlot D is a parcel of 514 acres designated in the 1995 Madera County General Plan as open space. It is designated in the Coarsegold Area Plan as open space and public open space. (A.R. at 53.) The zoning district designation for the parcel is "Open Space/Manufactured Housing Architectural Review Overlay." (A.R. at 52–53.) The parcel is surrounded by vacant and developed single family residential and small-lot agricultural properties to the north, east, and west, with agricultural properties to the south. (*Id.*)

Communications tower/wireless communications facilities are permitted in such a parcel with a CUP. § 18.50.010(C)(6). The uses permitted and the structure height regulations in a manufactured housing architectural overlay district, which includes YLP, are the same as those permitted for the underlying zoning districts, with exceptions for manufactured housing installations, for which there are additional regulations. §§ 18.84.010(A), 18.84.030,

18.84.060. Section 18.88.040 provides that communications equipment buildings and supporting structures shall be permitted in any district, subject to review by the zoning administrator.[8] Section 18.50.010(A)(5) of the Zoning Ordinance permits in open space districts major transmission lines for greater than 70 KV, interregional gas transmission lines, or trunk communication.

Goal 5.H of the Madera County General Plan, adopted October 24, 1995, is to preserve and enhance open space lands to maintain the natural resources of the county. Policy 5.H.1 provides that the county shall support the preservation and enhancement of natural land forms, natural vegetation, and natural resources as open space. To the extent feasible, the county shall permanently protect as open space areas of natural resource value, including wetlands preserves, riparian corridors, woodlands, and flood plains. *Id.*

Simultaneously, Goal 3J of the Madera County General Plan provides with respect to utilities that Goal 3J is to provide efficient and cost-effective utilities. The County shall facilitate the provision of adequate communications service and facilities to serve existing and future needs while minimizing noise, electromagnetic, and visual impacts on existing and future residents. § 3.J.1 at 46; A.R. at 0471.29. Madera County telecommunications policies also stated at the time of the County's action that the most appropriate sites for the location of a communications facility or tower in accordance with county policies were first, agricultural areas; second, on existing structures, such as barns, silos, water or PG & E towers; and adjacent to existing structures. (A.R. at 0471.30.)

A consideration of all aspects of the plan shows that the preservation of natural resources in open spaces is a valued goal, and that the protection should be permanent for some types of open space, such as areas of natural resource value, including wetlands preserves, riparian corridors, woodlands, and flood plains. However, co-existing goals are providing efficient and cost-effective utilities; facilitating the provision of adequate communications service and facilities; and minimizing noise, electromagnetic, and visual impacts.

Defendant contends that the parcel is a recreational area and points to form letters and individual letters of several residents regarding their decision to locate there because of, and their appreciation for, the natural beauty of the area. (Def.'s Opp. at 5–6.) This contention speaks to the recreational use of the larger parcel. However, nothing in the record indicates that the natural land forms or vegetation would be significantly compromised by the project; as is discussed in more detail below, the generalized aesthetic objections are without foundation. Further, although the recreational use may be the principal use of the larger open space of the parcel, the northerly portion of the parcel at the precise location of the proposed facility has been used for a substantial period of time for a for-profit public utility to which the communications facility would be attached. The 50,000 gallon water tank belonged to a for-profit public utility pursuant to Madera County's previous variance. (A.R. at 0471.23–.24.)

8. Section 18.04.121 defines a "[c]ommunication tower/wireless communications facility" to include any structure used to support a device utilized to transmit, relay and/or receive wireless communication together with the equipment and structures necessary to operate such a facility. A "communications equipment building" is any building housing operating electrical and mechanical equipment necessary for the conduct of a public utility communications business with or without personnel. § 18.04.120.

Given the present use of the site and the design of the project, permitting the project would have permitted achievement of both the preservation of what natural resources were present as well as achievement of the goal of facilitating telecommunications services with the least visual impact and noise. Because the precise area of the site is not open space, prohibition of the project would not have significantly served the goal of protecting open space. The Court notes that the County simultaneously permitted in the open space districts uses similar to the communications facility, such as major transmission lines greater than seventy kilovotes. (*Id.* at 0471.30.) The County had also previously granted CUP's to approve wireless communications towers in consistent circumstances. (*Id.*)

Defendant argues that some of the expressed concerns of the residents related to the aesthetic effects of the facility. These concerns are treated in more detail below. Another concern was that permitting the facility would lead to other similar commercial ventures. (A.R. at 223–318.) Although co-location was encouraged, no other company had indicated interest in the site. (*Id.* at 471.38.) The record reveals only one reference to another pending application; it was from Cingular Wireless for a traditional cell tower operation on the east side of Highway 41 down near the intersection of the Highway and Yosemite Springs Parkway. Although it was in the same general area, it was not for the Revis Mountain site.[9] Plaintiff's representative stated at the hearing that no other companies had expressed an interest in the Revis site. (A.R. at 38–39.) Thus, the fear of other commercial ventures was objectively unreasonable, speculative, and not supported by the record.

Considering all the evidence in the record, the Court concludes that granting the CUP would have permitted preservation of natural space as well as facilitation of efficient, cost-effective telecommunications facilities at the most appropriate sites. Substantial evidence does not support the conclusion that the project was inconsistent with the general plan.

## B. *Aesthetics*

■ Defendants argue that residents of the vicinity of the proposed facility believed that the facility would be an eyesore that could adversely affect their views and property values. Defendants rely on the principle that aesthetic considerations are a valid basis for the exercise of the local police power and for a decision on a conditional use permit. Defendants cite *Kucera v. Lizza,* 59 Cal.App.4th 1141, 1148, 69 Cal.Rptr.2d 582 (1997), which upheld local regulation of trees for the purpose of preserving light and space.

The Court accepts the proposition that Defendants retain local control over land use issues generally, including aesthetics. The issue, however, is whether this particular decision was supported by substantial evidence.

A substantial body of evidence established that the antennae, which were two inches in diameter at the top, were largely invisible to persons situated at the north, northeast and northwest of the water tank, where most of the residential development in YLP had occurred. (A.R. at 179, 183.) A memorandum from Nickel, his testimony, and an accompanying visual presentation showed that because of screening provided by oak, pine trees and brush, even the water tank itself could not be viewed from most of the areas around YLP. (*Id.* at

9. The record also reflects that two other communications facilities existed at distances of

seven miles from the water tower. (A.R. at 95.)

0471.9–.10; 179.) It was visible from an area near Blue Heron Court. (*Id.* at 0471.10.) Dennis Bell, who could see the tank from his patio, testified that the antennae would not worsen the view. (*Id.* at 0471.62–.63.) A few other residents wrote that any intrusion into the "greenbelt" was slight; because the massive water tank existed already, the "monstrous" tank nullified any visual objection. (*Id.* at 361, 356, 366.) Several residents wrote that the type of antennae to be installed were almost invisible at any significant distance, (*id.* at 342, 357), and the antennae would not be obtrusive or an eyesore. (*Id.* at 322, 342.)

The record does reflect that the antennae would be visible from the Dutton residence and another residence on North Dome Drive. (*Id.* at 78, 184.) The minutes of the Planning Commission meeting of February 6 confirm that several property owners had homes facing the lot and that the facility would be "visually intrusive." (*Id.* at 88.) One resident who lived very close to the tank sought to have the property preserved in its native state and stated that the four antenna poles would make the top of Revis Mountain "more ugly than it already is," although he stated that the ugly water tank had been there since the inception of the park. (*Id.* at 74–75.) Two other residents objected to the unsightliness of an "array of poles and antennas, with guy wires and blinking lights," which would not look natural and would detract from the natural appearance. (*Id.* at 76.) One resident of Blue Heron Way who lived about 400 to 600 feet from the site wrote that he could see the site and objected that "four cell phone transmitting towers" would be visible and distasteful. (*Id.* at 225–26.)

Constituent testimony and letters, in combination with other evidence or circumstances, can constitute substantial evidence supporting a denial on aesthetic grounds.

*AT & T Wireless PCS v. City Council of Virginia Beach,* 155 F.3d 423, 424–31 (4th Cir.1998) (where the majority of the citizens expressed repeated opposition to towers in a heavily wooded residential district with no above-ground power lines or significant commercial development); *Southwestern Bell Mobile Systems, Inc. v. Todd,* 244 F.3d 51, 58 (1st Cir.2001) (a denial based not only on aesthetics but also attractive nuisance and adverse effect on property values was upheld where the provider sought to erect a 150–foot–high lattice telecommunications tower, painted contrasting red and white, and a related equipment shed, propane tank and utility pole, surrounded by an eight-foot-high fence painted green and topped with three rows of barbed wire, atop a fifty-foot hill in an open field at the center of town in a low-density residential area in a suburban agricultural zone, 1300 feet from two forty-foot-high water towers, within 200 to 300 feet of residences, and within 350 feet of an elementary school); *Aegerter v. City of Delafield,* 174 F.3d 886, 889–891 (7th Cir. 1999) (denial of application to replace existing 360–foot–tall tower in a residential area on a high hill with a 422–foot–high tower fifty-one inches wide at the base because of an inappropriate expanding commercial use and lack of aesthetic harmony with the neighborhood was held to be supported by substantial evidence where although it was a legal nonconforming use, it conflicted with a developing policy to limit such structures in residential neighborhoods, and there was evidence of negative effect on property values in the form of testimony by residents that they had moved into the area with the understanding that the present tower could not be expanded); *Airtouch Cellular v. City of El Cajon,* 83 F.Supp.2d 1158 (S.D.Cal. 2000) (finding substantial evidence (letters; petition; testimony regarding aesthetics, property values, safety, and privacy; and

photographs) to support denial of an application to install multiple antennae on top of a water tower owned by a water district and to build a 360–square–foot building in a residential suburban area 120 to 135 feet from the nearest residence because of over-intensification of services, a preference to locate in commercial zones when possible, adverse effects on property values, noise, and safety).

However, limited speculative or generalized expressions of concern for aesthetics have been held not to constitute substantial evidence. *Omnipoint Corp. v. Zoning Hearing Bd.* 181 F.3d 403 (3d Cir.1999) (holding that the absence of a study on the effects of such a facility on property values and an absence of a showing of lack of adverse effect on the general character of the neighborhood did not justify a denial of a special exception to permit a 114–foot monopole in a sparsely populated mountainous region of a township on the basis of aesthetics/visibility and related decline in property values where ninety-foot-high trees would surround the pole and where the main objections were general and speculative (eleven neighbors briefly addressed the visibility and presented no evidence regarding property values) and concerned health effects); *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490 (2nd Cir.1999) (denial of special use permits to construct antennae on water towers based on safety issues, lack of consideration of noise and traffic, and aesthetic concerns held not to be supported by substantial evidence where the telephone company submitted evidence of need for the site, evidence suggesting no adverse effect on the character of the neighborhood or value of nearby real estate, and scientific evidence on radio frequency emissions (RFE's), and the opposition consisted mostly of commentary by citizens regarding perceived health threats and occasional generalized expressions of concern regarding aesthetics or the effect on property

values); *Telespectrum v. Public Service Com'n of Kentucky,* 227 F.3d 414 (6th Cir.2000) (holding that denial of an application to erect a 199–foot tower in a heavily wooded rural area devoted to agriculture, more than 1000 feet from four residences in the area and not subject to local zoning or land use requirements, was not supported by substantial evidence where the provider researched all other electronically possible sites but found them unavailable or inappropriate, presented a licensed appraiser's testimony that property values would not be hurt that was based on studies, and the opposition was a single homeowner's generalized fears to health and property values); *see Preferred Sites, LLC v. Troup County,* 296 F.3d 1210, 1219 (11th Cir.2002) (holding that generalized concerns of citizens about aesthetics were insufficient to constitute substantial evidence, characterizing the point of law as permitting aesthetic concerns to support denial of a permit where there is substantial evidence of the visual impact of the tower before the board, and citing *Southwestern Bell Mobile Sys., Inc. v. Todd,* 244 F.3d 51, 61 (1st Cir.2001), *Omnipoint,* 181 F.3d 403, *Aegerter,* 174 F.3d 886, *Oyster Bay,* 166 F.3d 490, and *Telespectrum,* 227 F.3d 414 in support).

Here, the small quantum of evidence consists in the main of generalized aesthetic concerns. Some of the expressions of concern were clearly based on mistaken assumptions about the nature of the facility, such as its being a tower or a brightly lighted protrusion. The few objections of the neighbors living near the site amount to assertions of aesthetic intrusion or degradation. In view of the over-arching presence of the concededly ugly and massive water storage tank, which predated the building of all the homes concerned in this discussion, these assertions regarding several small antennae are without a factual foundation and are tantamount to

speculative and generalized concerns. Common sense dictates that because of the small size and painted surfaces involved[10], the antennae will not even be visible to the vast majority of the inhabitants of the area. Although the record contains photographs, the photographs merely demonstrate the *de minimis* presence of the antennae, which appear as the most minor augmentation of the water storage tank, a looming, massive structure that, where visible, dominates the scene. Thus, the photographs are not evidence that could reasonably be accepted as substantial evidence of any visual impact or as substantial support for an assertion of visual obtrusiveness or degradation.

As to the cabinets, there is no evidence that the cabinets, which would be enclosed and fenced, would be visible to anyone who was not at the site itself, which already contained extensive chain link fencing around the water tank. (*Id.* at 183.)

Accordingly, the Court finds that a denial based on aesthetic considerations is not supported by substantial evidence.

### C. *Property Values*

■ A generalized fear of decline in property values, particularly when opposed by expert testimony that studies existed that showed no adverse effects from the facility in question, has been held not to be substantial evidence to support a denial. *Omnipoint Corp. v. Zoning Hearing Bd.* 181 F.3d 403, 409 (3d Cir.1999). An expert's analysis will constitute substantial evidence. *Cellular Telephone Co. v. Zoning Board of Adjustment of the Borough of Ho–Ho–Kus,* 197 F.3d 64, 72–73 (3d Cir. 1999).

To the extent that Defendants rely on aesthetic concerns as a basis for a reduction in property values, Defendants point

to no specific evidence, as distinct from a generalized concern about aesthetics, that would support a finding that property values would diminish because of the appearance of the proposed facility. The record does not provide more than a scintilla of evidence in this regard.

The record contains significant evidence that the facility would not negatively affect property values. The Staff Report to the Planning Commission, dated February 6, 2001, states that the project will not cause any substantial or adverse effect upon the property values or general desirability of the neighborhood or of the county because of the limited visibility of the antennae to the surrounding developed property. (*Id.* at 56.) The memorandum and testimony of Arlan Nickel, site acquisition representative of Plaintiff, before the planning commission indicates that the project was designed to blend into the industrial or public utility land use found adjacent to the water tank; situating both the antennae and cabinets near the tank would almost eliminate any additional visual impact and render the project virtually invisible to the residential areas of YLP. (*Id.* at 71.) Nickel expressly based his opinion that the particular type of installation would not have any adverse effect on property values or general desirability on "experiences we have had with other similar wireless installation in other communities." (*Id.* at 71.) Nickel testified that a variety of towers did not lower property values when they blend with their surroundings, such as office buildings or homes. (*Id.* at 143.)

The record did contain letters from neighbors who represented that they had moved into the neighborhood with the expectation that it would remain open space. (*Id.* at 76, 125.) However, the space sig-

---

10. The Court considers the project as it was presented to the County, and thus with the

conditions developed during the local process. *See, e.g.,* A.R. at 97–100.

nificantly affected by the project was not an area of pristine open space, but rather was a utility easement already being utilized by a for-profit utility company. The facility was not inconsistent with the maintenance of open space because it was not located in open space, but rather in an area in which use by a public utility was already established and extensive.

One resident located within 300 feet of the site whose property was adjacent to the service road wrote that neighbors had shown her real estate industry studies that indicated that a cell phone site would lower property values because of the perceived danger of the facilities. (*Id.* at 241.) Another letter from a resident of North Dome stated that property values were impacted by perceived health threats; she stated that she enclosed an article, which did not follow her letter in the record, but which was apparently quoted by another resident during testimony. (*Id.* at 243, 0471.74.) It appears that the article concerned decline in property values caused by proximity to towers with transmission lines and perception of a danger from the lines; the identity of the source appears to be the Illinois Real Estate letter. The testimony was to the effect that because over fifty percent of the residents of YLP who sent in form letters were concerned with the health effects of cell antennae, it could be inferred that there would be a decline caused by the proposed facility. (*Id.*) Another resident testified about a court case involving a taking of private property for public use in which a utility company sought an easement for power lines; the court considered that dangers associated with power lines had a depressing effect on the market value of adjacent properties. (*Id.* at 0471.79–.80.)

More generally, several residents feared that 1) the EMF's generated by the facility were a health risk, (*id.* at 124, 143, 226, 244); 2) perception of a health risk caused by the EMF's would cause a reduction in property values (*id.* at 78) or a reduced population of buyers due to the perception of a health risk (*id.* at 226, 239, 241, 243); or 3) the project would result in proliferation of antennae or other commercial uses, (*id.* at 126, 142, 225, 233, 239, 244, 250). Over thirty form letters cited both an actual and perceived health risk, as well as proliferation and a generalized concern for property values. (*Id.* at 250–311.) Other communications expressed a generalized concern regarding property values. (*Id.* at 88, 253–54.)

The reference to real estate studies was generalized; no specific study or testimony by a qualified expert appears in the record. An article about transmission lines, which are not a part of the communications facility in question, does not constitute expert evidence regarding the effects on property values of a wireless telephone facility.

The concern regarding proliferation is not supported by any evidence of any other applications and thus is speculative. As Defendant's counsel effectively conceded during argument, the concerns regarding property values in this case cannot meaningfully be distinguished from a generalized fear of the possible environmental effects of EMF's. Where the project complies with the Commission's regulations of radio frequency emissions, fear of possible environmental effects of EMF's are not a valid basis for denial of a permit pursuant to § 332(c)(7)(B)(iv), which provides:

No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless services facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply

with the Commission's regulations concerning such emissions.

*See New Par v. City of Saginaw,* 301 F.3d 390, 398 (6th Cir.2002); *Telespectrum, Inc. v. Public Service Commission of Kentucky,* 227 F.3d 414, 424 (6th Cir.2000); *Cellular Telephone Co. v. Town of Oyster Bay,* 166 F.3d 490, 494 (2nd Cir.1999).

In summary, the record contains evidence that the particular design and nature of the proposed facility are such that property values would not decline. Although the record contains considerable evidence of concern about reduced property values, it is a generalized concern based on the presence of a cell site and actual or perceived health threats therefrom. The complaints about property values were really a proxy for concerns about possible environmental effects of RFE's, which cannot provide the basis to support a decision concerning the placement or construction of a facility.

The Court concludes that in light of the whole record, substantial evidence does not support the conclusion that the site would lower property values.

### D. *Public Health, Safety, and General Welfare*

■ Defendants do not indicate what evidence would support a decision that the project was contrary to the public health, safety, and general welfare. The record contains extensive evidence supporting the safety of the project: 1) the conclusion of the Staff Report to the Planning Commission of February 6, 2001, to the effect that in accordance with the findings made by the FCC, the project would not pose a threat to public health or safety, and that it would have to meet FCC standards for radio frequency operations, (*id.* at 55); the independent report of the consulting engineering firm Hammett & Edison to the effect that the site will produce only 500 watts of power in any direction, and only 5.5 per cent or less of the allowable FCC standards for power levels for wireless antenna facilities, which would decline to 1 per cent rapidly, (*id.* at 180, 194–200); the testimony of Robert Wella, the senior engineer at Hammett & Edison, that the project met all safety requirements and that at the nearest residence, the highest calculated result was a tiny fraction of one percent of the amount permitted by the safety standard, (*id.* at 0471.31–.32); and the support of the Madera County Fire Department and Sierra Ambulance Service, as well as the YLP chief of security, for the anticipated increase in the ability to receive emergency calls and to investigate emergencies with the privacy that the cell phones would provide, (*id.* at 0471.55–.56, 0471.61–.62, 337).

In view of an absence of countervailing evidence in the record, the Court concludes that substantial evidence does not support the conclusion that the project would be contrary to the public health, safety, and general welfare.

### E. *Nuisance Because of Noise*

■ The Planning commission Staff Report of February 6, 2001, indicated that only a minimal amount of noise would be generated from electrical equipment on the site. (*Id.* at 55.) A memorandum of Arlan Nickel dated January 11, 2001, indicated that small air conditioning units would produce a very low level of noise as the machinery would cycle on and off in operation; from a distance of fifty to seventy-five feet, the noise would be imperceptible to adjacent properties. (*Id.* at 70.) The mitigated negative declaration of the Madera County Environmental Committee stated that no significant amount of noise would result. (*Id.* at 80.)

Bill Thiesen, senior consultant with the firm of Brown–Buntin Associates of Visalia, testified that his firm studied the po-

tential noise impacts from the equipment cabinets. The main source of noise, cooling fans, would be reduced by the metal cabinets, which were several hundred feet from the nearest residences; one residence was further buffered by the presence of the water storage tank between the cabinets and the residence. Thiesen took the noise levels at five feet as measured by the manufacturer and calculated with a straight geometric progression therefrom what the noise would be several hundred feet from the cabinets; the methodology was conservative so that the actual numbers would be even smaller than calculated. At most, as calculated the noise levels at the nearest residences were in the twenties and thirties of decibels, which would be inaudible or barely audible. A whisper is twenty decibels. (*Id.* at 471.45–.48.) Madera County's permissible noise level at night was forty-five decibels. (*Id.* at 471.48.) Thiesen recommended that the one side of the cabinets that generated the most noise be situated so that it did not face the residences nearby. (*Id.* at 471.46.) Plaintiff further offered to enclose them with a concrete block structure which would completely block out all noise. (*Id.* at 471.48.)

A report confirming this testimony was submitted. (*Id.* at 187–92.) The report noted that with respect to the closest house, which was 250 feet away, the water storage tank stood between the house and the antennae of the facility; the next closest house was more than 300 feet away. (*Id.* at 192.)

Residents expressed their fear that the site would be noisy at the meeting before the Planning Commission on February 6, 2001. (*Id.* at 88.) One resident wrote that the cooling systems would be noisy, and that noise travels in the mountains. (*Id.* at 226.) Another family with a disabled adult son who was overly sensitive to sound wrote that the son might be irritat-

ed by the noise if engaging in recreation in the area and that the forty-decibel noise level would be heard by people using the area for recreation. (*Id.* at 237–40.) Some of the form letters previously mentioned had checks by an item that read, "The noise levels may be an excessive nuisance in the local neighborhood due to the way sound travels in the foothills." (See, e.g., *id.* at 254.) A resident who represented that she lived closest to the water tower testified that she could hear every word that is said when the "water people" went up to the water tower, and she could hear the pumps going all night long. (*Id.* at 0471.72–.73.) Another resident who lived probably within a few hundred meters of the water tower testified that sound traveled and was amplified by the mountains; she could hear everything, including music and dogs barking, within a hundred acres of where she lived. (*Id.* at 471.76.) Another resident testified that she had visited a wireless telephone facility on Lilly Mountain described as "similar," and she had heard two different noises emanating from the equipment at "very loud levels." (*Id.* at 75.)

The complaint about being able to hear people servicing the water tank is not shown to be applicable to the telecommunications facility, which will require only two service visits monthly that will occur between eight a.m. and five p.m. (*Id.* at 66.) Likewise, there is no foundation for the conclusion that the Lilly Mountain facility was significantly similar to the proposed facility for Revis Mountain. There is no basis for an inference that a neighbor who could hear music of unspecified volume and dogs barking would necessarily hear the running of the cooling fans, which was tantamount to the whisper of a human voice.

The proposition that sound travels differently or farther in the mountains, ex-

pressed by residents and one supervisor, appears to have been based on the experience of the persons who commented on the phenomenon. However, there are no data on the travel of a sound at as low a decibel level as that in the instant case in the specific location and terrain of the proposed facility. There is no evidentiary basis for intelligent application of the general principle that sound travels differently in the mountains. A conclusion that the noise from the cooling fans would be heard by anyone is essentially speculative and does not constitute substantial evidence to support a conclusion that the noise constituted a nuisance, which is defined by California law as anything which is injurious to health, or is indecent or offensive to senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property. Cal. Civ.Code § 3479.

Accordingly, the Court concludes that substantial evidence does not support a finding that the CUP should be denied because the proposed facility would constitute a nuisance because of noise.

In summary, because the Court concludes that the denial of the CUP was not supported by substantial evidence and thus cannot stand, the Court does not reach the additional issue of whether the County's denial of the CUP prohibited, or had the effect of prohibiting, provision of wireless services within the meaning of 47 U.S.C. § 332(c)(7)(i)(II). *See New Par v. City of Saginaw*, 301 F.3d 390, 399–400 (6th Cir. 2002) (approving a district court's decision to order issuance of a permit upon a finding of lack of substantial evidence to support denial of the permit); *Cellular Tel.Co. v. Board of Adjustment for the Borough of Paramus*, 37 F.Supp.2d 638, 652 (D.N.J. 1999) (holding that in view of the court's order to issue the permit based on a lack of substantial evidence, it was unnecessary to reach additional issues).

## IV. *Remedy*

■ The statute does not specify the appropriate remedy if a court determines that a local authority violated the requirements of the statute. However, the statute clearly empowers, and indeed enjoins, the Court to hear and decide the case before it. 47 U.S.C. § 337(c)(7)(B)(v). It has been held that where remand would serve no useful purpose, an order granting equitable relief in the nature of an injunction or mandamus to the local authority to issue the relevant permits is an appropriate remedy under the statute where a local zoning decision prohibiting a CUP is not supported by substantial evidence. *New Par v. City of Saginaw*, 301 F.3d 390, 399–400 (6th Cir.2002); *Preferred Sites, LLC v. Troup County*, 296 F.3d 1210, 1220–22 (11th Cir.2002) (noting that federal courts may issue all writs in support of their jurisdiction pursuant to 28 U.S.C. § 1651); *Brehmer v. Planning Bd.*, 238 F.3d 117, 120–22 (1st Cir.2001); *Omnipoint Corp. v. Zoning Hearing Board*, 181 F.3d 403, 409–10 (3rd Cir.1999); *Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 497 (2nd Cir.1999).

As previously noted, there is no suggestion by either party that any additional evidence is needed. All grounds for denial of the CUP advanced by Defendants have been addressed. No evidentiary or other purpose for a remand has been suggested. Ordering the granting of the permit would effectuate the Court's determination and Congress's intention that the case be heard "on an expedited basis." 47 U.S.C. § 337(c)(7)(B)(v).

Defendant asserts that it would be illegal under unspecified portions of the California Environmental Quality Act (CEQA) to order the CUP to issue without a certification of the adequacy of the mitigated negative declaration. The Court disagrees with defense counsel's suggestion ad-

vanced at the hearing that this Court steps into the shoes of the County. Congress has imposed upon the Court the obligation to hear and decide the question of whether the County's denial of the CUP was in writing and was supported by substantial evidence; however, there is no indication in the statutory scheme that Congress intended this Court to undertake the functions of the local decision maker. This Court's remedial power is sufficiently broad to effectuate its decision. *See Brehmer v.Planning Board of the Town of Wellfleet,* 238 F.3d 117, 121–22. However, Defendants retain the power to do all that is necessary and proper in order to comply with the Court's order regarding issuance of the CUP.

### V. *Remaining Issues*

In the motion for partial summary judgment and summary adjudication, Plaintiff prayed for summary adjudication based on a violation of 47 U.S.C. § 332(c); it reserved for adjudication or trial its due process and 1983 claims. (Mot. at 2.) At the hearing, Plaintiff's counsel stated that Plaintiff had trailing claims for damages and attorney's fees. A review of the complaint does not reveal any claim or prayer in which damages was mentioned. Plaintiff's complaint states the following claims: 1) violation of the Telecommunications Act of 1996 (47 U.S.C. § 332) warranting injunctive relief; 2) violation of the Communications Act of 1934 and the FCC regulatory scheme warranting injunctive relief; 3) arbitrary and capricious denial of property rights pursuant to the Fifth and Fourteenth Amendments warranting injunctive relief; 4) violation of 42 U.S.C. § 1983 warranting injunctive relief; 5) administrative mandamus pursuant to Cal. Code Civ. Proc. § 1094.5 for abuse of discretion and acts undertaken in the absence of substantial evidence warranting equitable relief; and 6) declaratory relief. All the claims and the concluding prayer of the complaint seek in essence the issuance of the CUP. Thus, there is no trailing claim for damages before the Court. Further, it appears that by way of this motion, Plaintiff has become entitled to all the substantive relief sought in the complaint. However, Plaintiff will be given an opportunity to explain what remains to be adjudicated in a telephonic status conference.

There is a prayer for costs of suit and attorney's fees in the complaint. The legal basis for any claim for attorney's fees is not clear. However, Plaintiff may make an appropriate application for costs and fees.

Accordingly, it IS ORDERED that

1. Plaintiff's request for judicial notice in support of motion for summary judgment IS GRANTED; and

2. Plaintiff's motion for summary adjudication on Plaintiff's claim of violation of 47 U.S.C. § 332(c)(7) IS GRANTED with respect to Plaintiff's claims that Defendants failed to render their decision denying Plaintiff's application for the conditional use permit in writing and Plaintiff's claim that there was a lack of substantial evidence to support the denial of the conditional use permit within the meaning of 47 U.S.C. § 332(c)(7)(B)(iii) and (iv); the motion is otherwise denied; and

3. In order to inform the Court of the status of the proceedings, counsel for the parties ARE ORDERED to participate in a telephonic status conference set for October 31, 2003, at 11:00 a.m.

IT IS SO ORDERED.